[L. A. No. 6219. In Bank.—April 1, 1920.]

## J. A. BARLOTTI, Petitioner, v. D. B. LYONS, as Registrar, etc., Respondent.

[1] CONSTITUTIONAL LAW—AMENDMENTS TO CONSTITUTION OF UNITED STATES.—In so far as the constitution of the United States speaks upon the matter of amendments thereto, it controls, and any provision of a state constitution in conflict therewith must be held as naught.

[2] ID.—RATIFICATION OF AMENDMENTS BY "LEGISLATURES" OF STATES —CONSTRUCTION OF CONSTITUTIONAL PROVISION.—The word "legislatures" as used in article V of the constitution of the United States, requiring amendments to the constitution to be ratified by the legislatures of three-fourths of the states, where Congress

---

1. Provision of constitution for amendment thereof as mandatory or directory, note, 15 Ann. Cas. 786.

Effect of noncompliance with prescribed method of amending constitution, note, 10 L. R. A. (N. S.) 149.

in submitting the amendment proposes that method of ratification, means the official representative bodies invested with the lawmaking power of the several states as distinguished from the people themselves, and the referendum provision of our state constitution cannot be invoked in the matter of the ratification of such amendments.

[3] ID.—ADOPTION OF INITIATIVE AND REFERENDUM IN VARIOUS STATES—ORIGINAL MEANING OF CONSTITUTIONAL PROVISION UNCHANGED.—The provision of article V of the constitution of the United States requiring amendments to the constitution to be ratified by the legislatures of three-fourths of the states where Congress, in submitting the amendment proposes that method of ratification must be taken to-day to mean exactly what it meant when originally written into the constitution, regardless of the adoption during recent years in many states of the initiative and referendum.

PROCEEDING in Mandamus to compel the filing of a referendum petition relating to the ratification of the eighteenth amendment to the constitution of the United States. Dismissed.

The facts are stated in the opinion of the court.

Theodore A. Bell and Sloss, Ackerman & Bradley for Petitioner.

A. J. Hill, County Counsel, Robert B. Murphey, Assistant County Counsel, U. S. Webb, Attorney-General, and Robert W. Harrison, Chief Deputy Attorney-General, for Respondent.

ANGELLOTTI, C. J.—This is a proceeding in *mandamus*, the object being to procure a writ requiring respondent to file in his office for examination and transmission to the Secretary of State a referendum petition for the submission to the electors of the state, for their approval or rejection, of the joint resolution of the senate and assembly ratifying for the state of California what is known as the eighteenth amendment to the constitution of the United States, relating to intoxicating liquors. Two questions are presented; one being whether, in view of the provisions of

3. Ratification of amendments to federal constitution as subject to state referendum, note, 5 A. L. R. 1417.

article V of the constitution of the United States, the question of the ratification of the proposed amendment by the state was not finally and conclusively determined by the adoption of the joint resolution of ratification by the legislature, utterly regardless of the construction to be given to the provisions of our own constitution, and the other being, whether the referendum provisions of our state constitution (sec. 1, art. IV) may be construed as intended to be applicable in the case of a resolution of the character of the one here involved.

[1] With reference to the former of these questions, it is conceded, as necessarily it must be conceded, that in so far as the constitution of the United States speaks upon the matter of amendments thereto, it controls, and any provision of a state constitution in conflict therewith must be held as naught. Article V of that constitution, relative to amendments, in so far as is material here, provides: "The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to the Constitution, or, on the application of the legislatures of two-thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid, to all intents and purposes, as part of this Constitution, *when ratified by the legislatures of three-fourths of the several states or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress;* . . . " The italics are ours. In the case at bar, the amendment was proposed by the Congress of the United States, and the joint resolution of proposal declared that the amendment would "become valid as a part of the constitution when ratified by the legislatures of the several states as provided by the constitution." The effective words of ratification of the joint resolution of our legislature were: "Resolved by the senate and the assembly of the legislature of the State of California, jointly, at its forty-third session, . . . that the said proposed amendment be and the same is hereby ratified by the legislature of the State of California." The question we have in this connection is a very narrow one, being simply one as to the meaning of the word "legislatures" as used in the clause "when ratified by *the legislatures* of three-fourths of the several states" of article V of the constitution of the United

CLXXXII Cal.—37

States. If by those words was meant the *representative bodies* invested with the law-making power of the several states, which existed at the time of the adoption of the constitution, under one name or another, in each of the several states, and which have ever since so existed, as distinguished from the law-making power of the respective states, there is nothing left to discuss, for with that meaning attributed to the term, "the legislatures," the constitutional provision is so plain and unambiguous as not to admit of different constructions. The situation would then be that the people of the United States, in framing and ratifying the constitution in the manner provided therein, "have excluded themselves from any direct or immediate agency in making amendments to it, and have directed that amendments should be made representatively for them, by the Congress of the United States, when two-thirds of both houses shall propose them, or when the legislatures of two-thirds of the several states shall call a convention for proposing amendments, which, in either case, become valid, to all intents and purposes, as a part of the constitution, when ratified by the legislatures of three-fourths of the several states, or by conventions in three-fourths of them, as one or the other modes of ratification may be proposed by Congress." (*Dodge* v. *Woolsey*, 18 How. 331, 348, [15 L. Ed. 401, see, also, Rose's U. S. Notes].) As further suggested in this connection in the case just cited, the constitution of the United States is supreme in the matter of amendments regardless of whether or not the method prescribed thereby "be right or wrong politically."

[2] It certainly is not in consonance with the ordinary acceptation of the term "legislature" to take it as meaning otherwise than a representative body selected by the people of a state and invested with the power of law-making for the state, whatever be the power reserved to the people themselves to review the action of that body or to initiate and adopt laws. Our own constitution, notwithstanding its provisions in regard to the initiative and referendum, could not be more explicit than it is in its use of the term as meaning such a representative body, and while, in view of the initiative and referendum provisions, the people of the state may constitute a part of the law-making power of the state, they certainly are not a part of "the legislature"

within the meaning of that term as used in our constitution. By section 1 of article IV of the constitution it is declared that the representative bodies designated as the senate and assembly, concerning the membership of which and the method of selecting the members article IV makes provision, shall be designated "The Legislature of the State of California," and over and over again, wherever in the constitution the legislature is referred to, it obviously and necessarily means this representative body provided for therein, which is made up of the senate and assembly, designated as above stated. The initiative and referendum provisions constitute simply a reservation of power *in the people* to propose and enact laws *independent of "the legislature,"* and to adopt or reject any act of *"the legislature."* This has always been the meaning ordinarily attributed to the term in this country, and it is difficult indeed to conceive that the makers of the constitution of the United States, in providing for ratification *"by the legislatures* of three-fourths of the several states or by *conventions* in three-fourths thereof, as the one or the other mode of ratification may be proposed by Congress," intended by the words "the legislatures" anything other than the representative law-making bodies of the several states. At the time of the adoption of the federal constitution, as is shown by the brief of learned counsel for petitioner, every state had such a body, existing under one name or another, and, of course, it was to be assumed that, in accord with our guaranteed republican form of government, each state would always have such a body. Just what this *body* should be, what called, how constituted, whether bicameral in form or not, was a matter for each state to determine, but the essential characteristic of the thing was that it was a representative official body invested with the functions of law-making, the legislative official body of the state. That this conception of the meaning of the term was in the mind of the framers of the constitution is shown by other provisions. Section 2 of article I, providing that the House of Representatives shall be composed of members chosen by the people of the several states, provided that the electors thereof in each state "shall have the qualifications requisite for electors of the most numerous branch of the *State Legislature."* Obviously, there can be no question as to the

meaning of the term as here used. Section 3 of article I provided that the senate of the United States "shall be composed of two senators from each state, chosen by the *legislature thereof,*" etc., and in subdivision 2 of the section it was provided that "if vacancies happen, by resignation or otherwise, during *the recess of the legislature* of any state, the executive thereof may make temporary appointments until *the next meeting of the legislature,* which shall then fill such vacancies." Obviously, here again the term meant the official representative law-making body. In section 4 it is provided, the United States shall, "on application of *the legislature,* or of the executive (when *the legislature* cannot be convened)," protect any state against domestic violence. Subdivision 3 of section 1 of article VI provides that the senators and representatives, "and the members of the several state legislatures," etc., shall be bound, by oath or affirmation, to support the constitution. In all these five instances it indubitably appears that by the term "the legislature" was meant this representative body. In various other instances, exclusive of its use in article V, was the term used by the framers in the constitution with apparently no other meaning, and it has never been held by the United States supreme court that in any case where used in the constitution does it mean anything other than this representative body. In subdivision 2, section 1, article II, it was provided that "each state shall appoint, in such manner as *the Legislature* thereof may direct," electors of President and Vice-president. The word "legislature" here has been universally recognized to mean this representative body, and we have sustaining this construction the decision of the United States supreme court in *McPherson* v. *Blacker,* 146 U. S. 1, [36 L. Ed. 869, 13 Sup. Ct. Rep. 3, see, also, Rose's U. S. Notes]. In the course of his exhaustive opinion in that case, Chief Justice Fuller said: "The constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act *through their representatives in the legislature,* and leaves it to the legislature exclusively to define the method of effecting the object." The one exception, in so

far as any state courts are concerned (we are speaking of its use outside of article V) appears to be with reference to the words "the legislature thereof," in subdivision 1 of section 4 of article I, which provides: "The times, places, and manner of holding elections for Senators and Representatives shall be prescribed in each state by the legislature thereof; but the Congress may at any time, by law, make or alter such regulations, except as to the places of choosing Senators." The decision in *State* v. *Polley*, 26 S. D. 5, [127 N. W. 848], was put upon two grounds, the first being based upon the theory that this provision of the constitution *did not delegate* power to the legislature or the state to provide for the election of representatives, this power being one reserved by necessary implication to the various states, and that the whole purpose of the provision was simply to grant to the Congress the power to supersede by law enacted by Congress any state regulations on the subject. The second ground was, however, that the words "the legislature thereof" did not mean simply the representative body we have spoken of, but the "law-making power" of the state as established by the state constitution, and including the people of the state when authorized to act in view of referendum provisions contained in the state constitution. The same conclusion was reached by the supreme court of Ohio in *State* v. *Hildebrant*, 94 Ohio St. 154, [114 N. E. 55], but the decision in that case was also based on another ground, viz., the supremacy of an act of Congress which made the old districting act in Ohio the only effective method of electing members of Congress "until such state shall be redistricted *in the manner provided by the laws thereof.*" It was held that the Congress in enacting its paramount law on the subject (subd. 1, sec. 4, art. I) intended to provide that the old districting act of the state should remain in force until a redistricting was had in all respects as contemplated by the laws of Ohio, and that the insertion of the words we have italicized was for the very purpose of authorizing a resort to the referendum which was provided for in the constitution of Ohio, as seemed apparent from the debates in Congress on the adoption of the act. It was on this ground alone that the decision of the Ohio court was affirmed by the supreme court of the United States. (*State* v. *Hildebrant*, 241 U. S.

565, [60 L. Ed. 1172, 36 Sup. Ct. Rep. 708].) That, in view of that part of subdivision 1 of section 4 of article I clothing the Congress with paramount power to make regulations in this matter, the act of that body was a valid enactment, unless to include the referendum in the scope of legislative power was a violation of the guaranty of a republican form of government, appears to have been conceded, and the suggestion that it was beyond the power of the Congress in that it disregarded this constitutional guaranty was disposed of under the settled rule that such a question presents no justiciable controversy but involves the exercise by Congress of the authority vested in it by the constitution. (*Pacific Tel. Co.* v. *Oregon,* 223 U. S. 118, [56 L. Ed. 377, 32 Sup. Ct. Rep. 224, see, also, Rose's U. S. Notes].)

The alternative method of ratification which the Congress was given power by article V to provide implies that in the use of the words "the legislatures," etc., in the same article, these representative bodies were meant. The ratification was to be "by the legislatures," etc., or "by conventions [necessarily representative bodies] in three-fourths," etc., "as the one or the other mode of ratification may be proposed by the Congress." In each case it was a ratification by a *representative body* which, it was assumed, would correctly express the desire of the people of the state as to approval or rejection of the proposed amendment, that was apparently contemplated. The use of the words "by *the legislatures* of three-fourths,*"* etc., itself implies this meaning. The words imply some official body of a state as distinguished from the state itself or the people of the state or the whole law-making power of the state. If anything differing from the ordinary conception of the term had been intended, or anything different from its plain and obvious meaning as used elsewhere in the constitution in many instances, and so far as we can see in every other instance, it seems fair to assume that words indicating that meaning would have been used. It was said in *McPherson* v. *Blacker,* 146 U. S., at page 27, [36 L. Ed. 869, 13 Sup. Ct. Rep. 7]: "The framers of the constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids of interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text." It

is true enough that with regard to proposed amendments the idea was that each *state* should speak for itself in the matter of ratification by voting yea or nay thereon. But the further question considered by the framers of the constitution was *in what manner* the state should *give its vote,* for that, after all, is what the state is doing when it joins in the ratification of a proposed amendment to the federal constitution, and, as in the case of the selection of senators from each state, the people of the United States saw fit to provide that the vote should be given by "the legislature" of the state, doubtless concluding, whether correctly or not, that in this way the real desire of the people of the state would be correctly expressed. The adoption during recent years in many states of the initiative and referendum, of course implies, as did the amendment of the federal constitution with relation to the selection of United States senators, a conclusion on the part of very many people, that the representative body known as the legislature cannot always be relied on to express the real desire of the people of a state, but this view, in so far as it finds expression in constitutions or statutes, is certainly a matter of comparatively recent origin. We must continually bear in mind that our sole question in this connection is, What did *the framers of the constitution* intend by the term "the legislatures of . . . the several states" in article V? and that if by the term they intended the representative official bodies to which we have referred, as we think must be held, a state has no power to prescribe for itself a different ratifying power. All questions as to the good policy of such a provision, or whether it is in accord with the view entertained by very many to-day that the people of a state should have a vote on such a matter, are beside the question. The people of the United States in framing and enacting the constitution have ordained in article V thereof, in language that we think admits of only one reasonable construction, that in the matter of ratifying a proposed amendment the people of the respective states shall speak on the question of ratification *solely and finally through their official representative legislative bodies,* where the Congress in submitting the amendment proposes that method of ratification.

Our conclusion in this matter is in accord with that reached by the supreme court of Maine on this very ques-

tion.   (See *In re Opinion of the Justices,* 118 Me. 544, [107 Atl. 673].)   It is opposed to the conclusion of the supreme courts of Washington and Ohio.   (*State* v. *Howell,* 107 Wash. 167, [181 Pac. 920] ; *Hawke* v. *Smith,* 100 Ohio St. 385, [126 N. E. 400].)   In each of these cases there was a dissenting opinion.   In the Washington case, the prevailing opinion, written by Mr. Chief Justice Chadwick, exhaustively and forcefully presents the argument for a contrary conclusion. It seems to us, and we say it with the utmost respect for the learned judges who have reached a conclusion differing from ours, that the argument in support of their conclusion is, in the final analysis, based more upon some present day conceptions of what the law in this regard ought to be, than upon the intention of the framers of the constitution *as expressed therein,* and, to our mind, expressed so clearly as to preclude any other conclusion than the one we have reached.   **[3]**   Of course, all will admit that in so far as the question before us is concerned, the words of article V here involved must be taken to-day to mean exactly what they meant when originally written into the constitution, regardless of any change in view as to the wisdom of the policy of such a provision.   In other words, if they then meant the official *representative law-making body* of the state, they mean the same thing to-day, with the result that a change in the method can properly be accomplished only by amending the law.

In view of our conclusion on the question we have discussed, we deem it unnecessary to discuss the other question presented.

The alternative writ heretofore issued is discharged and the proceeding dismissed.

Shaw, J., Wilbur, J., Olney, J., Lennon, J., and Lawlor, J., concurred.