## STATE EX REL. W. YALE SMILEY v. MIKE HOLM.[1]

October 9, 1931.

No. 28,679.

[1] Reported in 238 N. W. 494.

*George T. Simpson* and *John A. Weeks,* for appellant.

*Henry N. Benson,* Attorney General, and *William H. Gurnee,* Assistant Attorney General, for respondent.

*Homer Morris,* amicus curiae, filed a brief in support of the contention of appellant.

WILSON, C. J.

The appeal is from an order sustaining a demurrer to the petition of relator, a citizen and taxpayer, on the ground that it did not state facts sufficient to constitute a cause of action.

These proceedings arise from an act of the seventy-first congress, approved June 18, 1929, entitled:

"An Act to provide for the fifteenth and subsequent decennial censuses and to provide for apportionment of Representatives in Congress."

The effect of the act was to reduce Minnesota's representatives in the house of representatives of the congress of the United States from ten to nine members. Intending to divide the state into nine congressional districts, there was introduced in the house of representatives in our state legislature a bill known as H. F. No. 1456 (see L. 1931, p. 640) which in form specified the counties to constitute each of such nine districts. This measure passed the house on April 16, 1931, and the state senate on April 20, 1931. It was transmitted to the governor, who promptly returned it to the house, where it originated, without his approval and with his written objections which in form constituted a veto. Two days later the house adopted the following resolution, to-wit:

"WHEREAS, on the 16th day of April, 1931, the House of Representatives of the State of Minnesota duly passed H. F. No. 1456, a bill for an act to divide the State of Minnesota into nine Congressional Districts; and

"WHEREAS, on the 20th day of April, 1931, said H. F. No. 1456 was duly passed by the Senate of the State of Minnesota; and

"WHEREAS, said bill is now in the possession of the House,

"Now, THEREFORE, BE IT RESOLVED, That the Chief Clerk of the House be and he is hereby directed to deposit for filing with the Secretary of State the enrolled copy of said H. F. No. 1456, said

bill to become and remain part of the permanent records of the office of the Secretary of State."

Five days later H. F. No. 1456 was deposited with the secretary of state in accordance with the terms of the foregoing resolution.

The population of the various congressional districts as specified in H. F. No. 1456, as shown by the census of the United States for the year 1930, was as follows:

"First congressional district ..........................228,596
"Second congressional district ..........................251,734
"Third congressional district ..........................291,601
"Fourth congressional district ..........................286,721
"Fifth congressional district ..........................344,500
"Sixth congressional district ..........................301,984
"Seventh congressional district..........................326,391
"Eighth congressional district ..........................276,633
"Ninth congressional district ..........................253,786"

An equal division of our population of 2,551,583 would allocate 283,509 inhabitants to each congressional district.

It is the duty of the secretary of state to receive filings of candidates for nomination to the office of representative in congress from all persons eligible to be candidates thereat; and to refuse such filings for nomination thereto when persons tendering the same appear to be ineligible. He also has charge of the printing of all necessary ballots, the expense of which is usually greater than the income from filing fees.

Soon after the adjournment of the 1931 session of our state legislature, a controversy arose as to whether the legislature had in fact prescribed the congressional districts in the state or whether the governor's veto had invalidated the efforts of the senate and the house. The secretary of state, claiming the governor's veto was a nullity, acted upon the theory that new districts had been created and accepted a filing fee from one or more persons as candidates in at least one of such districts and refused to accept filing fee from one who sought to be a candidate at large upon the theory that the legislature had failed to comply with the requirement of

congress. The relator herein seeks to sustain the veto of the governor and to have determined the question as to whether or not the proceedings of the senate and the house are a nullity.

In the United States constitution we find:

Art. I, § 4. "The times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to places of choosing senators."

In the constitution of the state of Minnesota we find:

Art. 4, § 1. "The legislature shall consist of the senate and house of representatives, which shall meet biennially at the seat of government of the state."

On August 8, 1911, the congress passed an act for the apportionment for representatives in congress among the several states under the thirteenth census. 37 St. 13, c. 5 (U. S. Code, title 2, § 2, et seq.). It was therein provided that the congressmen should "be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants." Section 3 of the act (U. S. Code, title 2, § 3). Such provision is not found in the language of the act of June 18, 1929. 46 St. 21. It is the contention of the appellant that said provision of the 1911 law is still in force because the act of 1929 provides that such redistricting should be made

"by apportioning the then existing number of Representatives among the several States according to the respective numbers of the several States as ascertained under such census, by the method used in the last preceding apportionment."

It is claimed that the foregoing language reads into the statute of 1929 that portion of § 3 of the 1911 statute which requires that the districts be composed of contiguous and compact territory and containing as nearly as practicable an equal number of inhabitants. It is also pointed out that the language of the 1911 act provides

that representatives to the sixty-third congress "and each subsequent Congress" should be elected from such districts.

The principal questions presented by appellant are: (1) That H. F. No. 1456 is invalid because vetoed by the governor and not passed over his veto; (2) that if H. F. No. 1456 is otherwise valid, the provisions of the same dividing the state into districts are so arbitrary and unfair as to violate the provisions of the act of the congress of August 8, 1911, and also certain provisions of the federal constitution.

■ For a long time congress passed apportionment acts following each decennial census act. Obviously these decennial statutes were enacted to meet the change in population, and it was always apparently contemplated that ten years hence another law of similar character would be enacted. In 1920 the congress did not enact such a law. Consequently the 1911 statute served. It was a general and permanent law at least for a time, and congress very properly caused the same to be included in the judicial code in 1926. Section 3 of the act of 1911 is as follows:

"That in each State entitled under this apportionment to more than one Representative, the Representatives to the Sixty-third and each subsequent Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. The said districts shall be equal to the number of Representatives to which such State may be entitled in Congress, no district electing more than one Representative." (37 St. 14.)

We construe the foregoing section as meaning that the provisions thereof were applicable only to elections held under "this apportionment" i. e. pursuant to the act of 1911. The law was apparently so written to so limit its application. The history of the enactment of these laws, necessitated by the national decennial census, confirms this belief. No such law having been passed by congress in 1920, the congress in 1929, apparently to meet the past omission and to avoid a repetition, enacted the 1929 law, which called for the fifteenth and subsequent decennial censuses and to provide for

apportionment of representatives in congress. It embraced the two subjects which had usually been covered by separate acts. Upon the enactment of the 1929 law, the 1911 act, so limited by its own language and so replaced by subsequent law, "was no longer upon the scene." The later law contained a clause repealing all inconsistent laws. Some portions of the 1929 law were inconsistent with the same sections in the 1911 law. In fact the 1929 law made provision which would replace all of the 1911 law, unless it was that portion of § 3 requiring the districts to have the characteristics therein mentioned. It is true that many statutory laws are cumulative and additional, but such statutes usually involve remedies whereby a class of persons may proceed under a prior law or under the one which gives cumulative or additional remedies. In the case before us the history, nature, purpose, and language of these statutes disclose a clear intention on the part of congress to have each of these apportionment acts replace its immediate predecessor. We believe it was the intention of congress to have the 1929 statute supersede and take the place of the entire statute of 1911. Until the 1911 act, it was made the duty of the legislatures of the several states to divide the respective states into districts. Such was their constitutional duty. The 1911 act went further and provided that the state legislatures in redistricting should act in the manner provided by the state laws. This was to reach and include the referendum, existing in some states, particularly in the state of Ohio. The clause "by the method used in the last preceding apportionment," as used in the 1929 act, we construe as relating exclusively to the arithmetical method of computation.

Congress has never attempted to modify the grant of this constitutional power to the state legislature, but it did assume in the act of 1911 to direct how the duty should be performed, that is, in accordance with the laws of the state. Since no direction now exists, we need not consider the power of congress to give this direction in the 1911 law. The constitutionality of that act may present a debatable question; but that is unimportant, since we hold that that law is no longer in the picture.

■ The act of 1929 does not require the districts to be "composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants."

We are of the opinion that the various provisions of our state constitution cited in the briefs are of little importance in relation to the matter now in controversy. The power of the state legislature to prescribe congressional districts rests exclusively and solely in the language of art. I, § 4, of the United States constitution. The provisions of the state constitution control and operate when the ordinary affairs of the state are involved. They cannot of course prevail as against the provisions of the superior fundamental law of our nation.

The legislature is required to "prescribe" the times, places, and manner of holding elections. This means "to lay down authoritatively as a guide, direction, or rule of action; to impose as a peremptory order; to dictate; appoint; direct." (Webster's New International Dictionary.)

The command to the legislature comes, as indicated, from the United States constitution. The reason why the state legislature acts in the matter is because of a mandate, not from the people of the state but from the people of the United States. It seems then that our first question is to be solved by ascertaining the meaning of the term "legislature" as found in the federal constitution, art. I, § 4.

The ordinary meaning of the word "legislature" is that it refers to the senate and house of representatives, which our state constitution [art. 4, § 1] says constitutes the "legislature." Within this meaning it indicates the representative body which makes the laws of the state and of which the chief executive is not a part, although he has a limited restraint upon the enactment of state laws. Perhaps the veto power is a legislative power. Gottstein v. Lister, 88 Wash. 462, 153 P. 595, Ann. Cas. 1917D, 1008; Spokane G. & F. Co. v. Lyttaker, 59 Wash. 76, 109 P. 316; In re Opinion of the Justices, 118 Me. 552, 107 A. 705, 5 A. L. R. 1407. The word "legislature" has also been used to indicate "the lawmaking power of the state." State ex rel. Schrader v. Polley, 26 S. D. 5, 127 N. W. 848; Hawke v.

Smith, 100 Ohio St. 385, 126 N. E. 400; State ex rel. Mullen v. Howell, 107 Wash. 167, 181 P. 920; Stuart v. Chapman, 104 Me. 17, 70 A. 1069; State ex rel. Davis v. Hildebrant, 241 U. S. 565, 36 S. Ct. 708, 60 L. ed. 1172. Appellant urges us so to hold. Under our state constitution the legislature consists of the senate and the house of representatives. We believe the word is ordinarily so understood. The frequent expression that our state, like the nation, has three branches of government, executive, legislative, and judicial, is seldom, if ever, understood as meaning that the governor is a part of the legislative.

In what sense was the word used in the federal constitution? Unless a contrary intent appears, we must accept words as used in their ordinary meaning; if so, little construction is here required.

The word "legislature" is found in other portions of the federal constitution. The members in the lower branch of the congress shall have the qualifications requisite to be members of the lower house of the "state legislature." Art. I, § 2. Also see the seventeenth amendment. Prior to the adoption of the seventeenth amendment, providing for the election of United States senators by popular vote, they were chosen by the "legislature." Art. I, § 3. The seventeenth amendment also authorized the "legislature" to empower the executive authority to make temporary appointments to fill vacancies in the United States senate until the people fill such vacancies as the "legislature" may direct. Prior thereto the governor was authorized to fill such vacancies by temporary appointments until the next meeting of the "legislature." Art. I, § 3. It is provided that the United States shall protect each state against domestic violence upon application of the "legislature." Art IV, § 4. It provides that members of the "state legislatures" shall take a certain official oath. Art. VI. The phrase "members of the legislature" is used in the fourteenth amendment, § 2, and also in § 3. It provides for the "consent of the legislature" to the United States government buying lands for certain purposes. Art. I, § 8. It prohibits two or more states merging without the "consent of the legislatures of the states concerned." Art. IV, § 3. It provides that amendments may be ratified by the "state legislatures." Art. V.

The same article provides that congress upon application of the "legislatures of two-thirds of the several states, shall call a convention for proposing amendments." It is provided that the presidential electors shall be appointed as the "legislature" may direct. Art. II, § 1. Then we have the provision now under consideration.

In the days when the "legislature" elected the United States senators, it was never suggested, so far as we are advised, that the governor could apply his veto power. Indeed in all the uses of the word "legislature" in these various provisions in the federal constitution, it would seem that it was used in the same sense—in the ordinary meaning, i. e. as being the representative body which makes the state laws and not all the governmental machinery which constitutes the lawmaking power of the state. Indeed at the time of the adoption of the federal constitution there were seven or more states wherein the veto power did not exist.

We think it was the spirit of the framers of the constitution that in ordinary questions of governmental affairs the majority should rule. We see no reason why they would intend to advance the proposition that if the governor was opposed to the judgment of the legislature it would have to determine questions referred to it by a two-thirds vote, as is required by our state constitution, instead of by a majority vote, while in those states where no veto existed a majority would always control. We cannot think that such consequential situation was intended. We must view the situation from the viewpoint of the framers of the constitution as it then appeared in their light. We cannot be controlled by what one might think the law ought to be now. The construction of such constitutional provisions sounds in fundamentals. The word "legislature" as so used necessarily had reference to legislatures as they were then known. A constitution must always be construed in the light of its history. The referendum was then unknown, and where it has been considered as a part of the lawmaking power relative to art. I, § 4, it was because of the act of 1911 providing that the redistricting was to be done according to the laws of the respective states. Congress itself by that act recognized the referendum as a part of the legislative authority of the state.

It is now the settled law that the state legislature, in ratifying amendments to the federal constitution, does not act in the discharge of its legislative duties as the lawmaking body but does act for and in behalf of and as representative of the people of the state, under the power conferred by art. V of the federal constitution. Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. ed. 871, 10 A. L. R. 1504; Barlotti v. Lyons, 182 Cal. 575, 189 P. 282; Decher v. Secretary of State, 209 Mich. 565, 177 N. W. 388; Whittemore v. Terral, 140 Ark. 493, 215 S. W. 686; Prior v. Noland, 68 Colo. 263, 188 P. 729.

The legislature in districting the state is not, strictly in the discharge of legislative duties as a lawmaking body, acting in its sovereign capacity, but is acting as representative of the people of the state under the power granted by said art. I, § 4. It merely gives expression as to district lines in aid of the election of certain federal officials; prescribing one of the essential details serving primarily the federal government and secondly the people of the state. The legislature is designated as a mere agency to discharge the particular duty. The governor's veto has no relation to such matters; that power pertains, under the state constitution, exclusively to state affairs.

The word "legislature" has reference to the well recognized branch of the state government—created by the state as one of its three branches for a specific purpose—and when the framers of the federal constitution employed this term we believe they made use of it in the ordinary sense with reference to the official body invested with the functions of making laws, the legislative body of the state; and that they did not intend to include the state's chief executive as a part thereof. We would not be justified in construing the term as being used in its enlarged sense as meaning the state or as meaning the lawmaking power of the state. We are of the opinion that the authorities support our conclusion. Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. ed. 871, 10 A. L. R. 1504; Brooks v. Fischer, 79 Cal. 173, 21 P. 652, 4 L. R. A. 429; Barlotti v. Lyons, 182 Cal. 575, 189 P. 282; Decher v. Secretary of State, 209

Mich. 565, 177 N. W. 388; Whittemore v. Terral, 140 Ark. 493, 215 S. W. 686; Prior v. Noland, 68 Colo. 263, 188 P. 729; In re Opinion of the Justices, 118 Me. 544, 107 A. 673, 5 A. L. R. 1412; State ex rel. Gill v. Morris, 79 Okl. 89, 191 P. 364; Carson v. Sullivan, 284 Mo. 353, 223 S. W. 571; Ex parte Dillon (D. C.) 262 F. 563; In re Opinion of the Justices, 254 Mass. 617, 151 N. E. 680. It follows that the governor's veto herein was a nullity.

State ex rel. Schrader v. Polley, 26 S. D. 5, 127 N. W. 848, is not in harmony with our conclusion. The opinion in that case was put upon two grounds, the first being based upon the theory that art. I, § 4, did not delegate power to the legislature or to the state to provide for the election of representatives; and it was said that this power was one reserved by necessary implication to the various states and that the whole purpose of art. I, § 4, was simply to grant to the congress the power to supersede by law enacted by congress any state regulation on the subject. The second ground was however that the words "the legislature thereof" did not mean simply the representative body we have spoken of, but did mean the "lawmaking power" of the state as established by the state constitution, and including the people of the state when authorized to act in view of the referendum provisions contained in the state constitution. The second ground in the Schrader case seems to have been overruled by Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. ed. 871, 10 A. L. R. 1504. We are not satisfied with the first reason given in support of the Schrader case, and we speak with the utmost respect for the learned judges who have reached a conclusion differing from ours. We feel that it was erroneous to claim that the action was taken under a power reserved to the people of the state without regard to the grant of power in the federal constitution. We think the state acts rather under a power surrendered to it. Certainly, congress must have the implied, if not the expressed, power to provide for the election of its members and to make all necessary laws in reference thereto. U. S. Const. art. I, § 8. We have not considered the matters involved herein in as great detail as were covered by the helpful memorandum of the learned trial court, and in reference to the reasoning of the South

Dakota case we now quote with approval a portion of the memorandum:

"There can be no inherent power in the people of South Dakota to legislate for any one except themselves. There can be no inherent power in the people of the State to adopt a Federal Constitution or to amend the Federal Constitution which is to govern the inhabitants of other states and territories. As a matter of fact, that Constitution may be amended and they may be subjected to the effects of such amendment without their consent and contrary to their expressed wishes. The Representatives in Congress are officers of the Federal Government. They legislate for all the people of the United States. They govern the District of Columbia, the Territory of Alaska and the island possessions of the nation. It does not sound plausible that any State may claim that it has inherent power or control over legislative, executive or judicial officers who are performing exclusively federal functions. The State does not have inherent power to determine who shall vote in a federal election, whether it be for President, Senators or Representatives. The right to vote in such an election is derived from the Federal Constitution exclusively. The Federal Government determines the term of office, the duties, powers and rights and the compensation of Senators and Representatives. It determines their apportionment to the several States. It is a Federal election to choose Federal Officers by Federal Electors, Ex parte Yarbrough, 110 U. S. 651, 4 S. Ct. 152, 28 L. ed. 274; Felix v. U. S. (C. C. A.) 186 F. 685. Congress has already fixed the time for Congressional elections. USCA, title 2, § 7. Nothing is left to the States except through their Legislatures to fix the places of election. As in the case now before the Court, so in the Schrader case, this was done by districting the State. It does not seem to be either an inherent and reserved power of the people of the State nor does it appear to be State legislation subject to the State Constitution."

In State ex rel. Davis v. Hildebrant, 241 U. S. 565, 36 S. Ct. 708, 60 L. ed. 1172, it was held that the act of 1911 expressly modified the phraseology of previous acts by inserting a clause mainly in-

tended to provide that where, by the state constitution and laws, the referendum was treated as a part of the legislative power, the powers thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts by law. The provision so inserted, permitting the redistricting to be done by the state "in the manner provided by the laws thereof," permits a referendum under the laws of Ohio and substantially recognizes the referendum as a part of the legislature of that state. No such provision is contained in the present act. The Hildebrant case seems to hold that congress has the constitutional power to control the method by which the state legislature may act, and may or may not subject its action to the referendum. If that be the true interpretation of that case, the congress has now deliberately omitted any such requirement and reverted to the character of legislation in vogue prior to 1911, when no control over legislative method was attempted to be exercised. The Hildebrant case is discussed in Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. ed. 871, 10 A. L. R. 1504.

■ The fact that the legislature voted upon the subject matter in the form of a bill is not controlling. Form does not control. We look to the substance. They voted upon the particular measure. No one misunderstood. The issue was clear. They definitely gave their assent to and expressed their determination fixing definite lines, accomplishing the redistricting as they saw fit. They prescribed the districts within the meaning of said art. I, § 4. In short, they did what the constitution said they should do. Their action was effectual.

■ Appellant calls our attention to the fact that on seven occasions prior to voting upon the measure now under consideration the legislature of this state has made state and federal reapportionments in the form of a bill for an act which was approved by the governor. We are of the opinion that such procedure as disclosed in appellant's brief is insufficient to support the claim of practical construction. We are also of the opinion that since the matter here involved arises out of the federal constitution and its meaning is so clear and the purpose is so apparent, the language being used

in its ordinary meaning, that there is no room for the application of the doctrine of practical construction. State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N. W. 951; State ex rel. Morris v. Wrightson, 56 N. J. L. 126, 28 A. 56, 22 L. R. A. 548.

■ Dividing the territory into districts under art. I, § 4, involved discretion, a discretion the extent of which cannot be well defined; a discretion on the part of the legislature, not on our part. If the provisions of the 1911 act were still in force, as contended, and serving as a command as to how the duty should be performed, we would be required to hold that the court could interfere only where such discretion is plainly and grossly abused. It is our function to review questions of law and not to revise official action involving the exercise of discretion. We are not to say whether the division is the best that could have been made, but whether the legislature proceeded according to legal rules. The legislature in this matter was exercising a political and discretionary power granted by the federal constitution for which the members are amenable to their constituents. How nearly equal in population such districts may be made in actual practice must depend largely upon the integrity of the legislature; and we find nothing in the record authorizing our interference even upon the hypothesis that the rule of conduct, as contained in the act of 1911, still prevails. State ex rel. Meighen v. Weatherill, 125 Minn. 336, 147 N. W. 105; Donovan v. Suffolk County, 225 Mass. 55, 113 N. E. 740, 2 A. L. R. 1334; People ex rel. Carter v. Rice, 135 N. Y. 473, 31 N. E. 921, 16 L. R. A. 836; People ex rel. Woodyatt v. Thompson, 155 Ill. 451, 40 N. E. 307; In re Baird, 142 N. Y. 523, 37 N. E. 619; State ex rel. Warson v. Howell, 92 Wash. 540, 159 P. 777; Wise v. Bigger, 79 Va. 269; 2 A. L. R. 1337, Anno. Though a case might arise that would require our disapproval, this does not seem to be such.

■ However, as already stated, we hold that the act of 1929 wholly replaces the act of 1911, and that the authority so given by art. I, § 4, is unrestricted, unlimited, and absolute; that is, the authority is not hampered by requiring the duty to be performed in any particular manner. The law does not prescribe any rule of conduct controlling the performance of the duty imposed. Under

such circumstances, in administrative and political affairs and in the absence of constitutional limitations, the action of the legislature is beyond the reach of the judiciary. We have no right to and hope to refrain from putting up our opinion against the opinion of those in whom the exclusive right to redistrict has been lodged. Under the circumstances we simply have no control over the legislature. Richardson v. McChesney, 128 Ky. 363, 108 S. W. 322, 129 A. S. R. 299; State ex rel. Morris v. Wrightson, 56 N. J. L. 126, 28 A. 56, 22 L. R. A. 548; 2 A. L. R. 1337, Anno.

■ It is claimed that H. F. No. 1456 is so unfair and the districts are so unequal in population that the redistricting is in violation of the fourteenth amendment to the federal constitution. A part of the argument is that two voters in the same district have the same power as three voters in another of the districts. The specific claim seems to be that the alleged violation of this amendment relates to the provision that "no state shall make or enforce any law which shall abridge the privileges, or immunities of citizens of the United States." It seems sufficient to say that while the constitution does not define the "privileges and immunities" of citizens, the right of suffrage is not one of them. Nor did the fourteenth amendment add to the "privileges and immunities" of a citizen. Minor v. Happersett, 21 Wall. 162, 171, 22 L. ed. 627; Pope v. Williams, 193 U. S. 621, 632, 24 S. Ct. 573, 48 L. ed. 817. We believe the argument advanced is fallacious and untenable, and are of the opinion that the fourteenth amendment is in no way violated.

· Affirmed.

DIBELL, J. (dissenting).

My view is that the apportionment of the state into congressional districts must be by legislation. Nor am I satisfied that if it is otherwise H. F. No. 1456, passed by the house and senate and returned to the house by the governor as a vetoed bill and by its resolution ordered deposited with the secretary of state, without other action thereon and without action by the senate, constituted an effective apportionment.

244

Stone, J. (dissenting).

I cannot agree that, because in assigning administrative or political functions to state legislatures the constitution excludes all other state agencies, the same conclusion is forced where, as in art. I, § 4, a specific lawmaking task is vested in them. Judgment based only upon identification of the agency selected ignores the more important factor of the kind of action demanded. Administrative and political action proceed in their own way and subject to their own peculiar limitations. Legislative action—lawmaking—is something very different, especially in a republic.

The necessity of submitting the result to executive approval or veto and the right to pass over a veto (although not found in all states) have from the beginning been characteristic of American constitutional government. Few other subjects gave the constitutional convention so much difficulty. Its members considered that the power of any legislature to make laws might wisely be subjected to a qualified executive veto. They so conditioned the lawmaking power of congress. It could well have been contemplated therefore that while any other kind of action would be by the legislature alone, the purely legislative function of lawmaking would be subject to conditions imposed by the state constitutions.

Wanted in every such case is state action. McPherson v. Blacker, 146 U. S. 1, 2, 13 S. Ct. 3, 36 L. ed. 869. The legislatures but speak for the states. The manner of their speaking naturally is that best suited or ordinarily resorted to for disposing of the matter in hand. If the latter requires lawmaking, then lawmaking of the ordinary kind and in the ordinary way must be contemplated.

That the convention was consciously dealing with a lawmaking function in art. I, § 4, is clear. The idea is suggested in the word "prescribed." It is confirmed by the grant to congress of the power "by law" to make or alter regulations made by the states. "The times, places and manner of holding elections" are not only appropriate to be dealt with by lawmaking but also wholly inappropriate to any other process. So I cannot conceive that the intention was any other than that the task assigned should be performed

by ordinary state legislation. Any restriction of state power to subject the lawmaking of its own legislature to executive veto must rest on remote and unnecessary implication, and so there is no such restriction.

Because under American theory the people themselves are the source of all governmental powers and the federal constitution but a grant of some, there is merit in the reasoning of the judges in State ex rel. Schrader v. Polley, 26 S. D. 5, 127 N. W. 848. We never think of any reserved power of the states as· one granted by the federal constitution to the new government and as immediately regranted by the same instrument to the states. But without bothering over mere language, the power now in question was plainly vested and confirmed in the state legislatures, however constituted.· So far, the provision was satisfactory to the states at the time.

But, Judge Story tell us, the whole section "was afterwards assailed by the opponents of the Constitution, both in and out of the State conventions, with uncommon zeal and virulence. The objection was not to that part of the clause which vests in the State legislatures the power of prescribing the time, places, and manner of holding elections; for so far it was a surrender of power to the State governments. But it was to the superintending power of Congress to make or alter such regulations." Story, Constitution (4 ed.) § 815.

There is no difference of substance between the South Dakota view that the power was "reserved" by the state governments and that of Judge Story that it was surrendered to them. They agree that the power remained in the "state governments." Had the state conventions or any single member of any of them considered any other view tenable, the debates would show it. The "uncommon zeal and virulence" of the opponents of adoption were such that not even slight and technical objections to the new national government were·overlooked. This one, if anyone had thought of it at all, would have been made much of, for the whole fight on the constitution was grounded on its effect as a surrender of state power.

McPherson v. Blacker, 146 U. S. 1, 13 S. Ct. 3, 36 L. ed. 869, is helpful only by contrast. The power there involved, of the state legislatures in the selection of presidential electors, was not legislative but political in character. State ex rel. Davis v. Hildebrant, 241 U. S. 565, 36 S. Ct. 708, 710, 60 L. ed. 1173, seems to me decisive of the main question. The power of congress principally discussed was that to decide what is republican government within the constitutional guaranty thereof to the states. It is to that alone that Mr. Chief Justice White directed most of his reasoning dealing with the powers of congress. It was considered plain, assuming the power had been invoked, that congress had recognized, in the act of 1911, that the referendum did not introduce any such "virus" as to make the Ohio state government other than republican. It was not held that congress had any power whatsoever to make or unmake the referendum as a part of the state legislatures as meant by art. I, § 4. On the contrary, the states are repeatedly referred to, in respect to their functions under that section, as acting "through their legislative authority" or as exercising "state legislative power for the purpose of creating congressional districts by law." That is, "legislature" as used in art. I, § 4, was considered synonymous with "the legislative power" of the states. Hence, it was concluded, the involved redistricting act was properly subject to veto by referendum under the Ohio constitution.

*That conclusion is impossible unless art. I, § 4, invokes the whole legislative power of the states.*

In that assertion I do not overlook the discussion by the court of the act of congress of 1911 and its effect, "in so far as Congress had power to do" it, of recognizing the validity of a referendum on a state redistricting act. The limitation, "in so far as Congress had power to do," is significant. Whatever power is possessed by the states or their legislatures has been the same ever since the constitution was adopted. The *exercise* of that power is subject to supervision (Ex parte Siebold, 100 U. S. 371, 25 L. ed. 717) but the *grant* of it not to modification, by congress. That body can no more modify or impose new conditions on the constitutional confirmation

of state power than it can amend the grant of its own. So it cannot say how or by whom the state power shall or may be exercised. It cannot say of what a state legislature may or may not consist for the purpose of its exercise.

Congress may "by law" make its own "regulations" or alter those of the states. It cannot say either that the state regulations shall or shall not be subject to veto by executive or people. That would be to amend the constitutional confirmation of power in the state legislatures, which has always meant either that their power was or was not subject to such veto. The act of congress of 1911, while it could not change the constitution, could and did construe it. The interpretation was that the whole legislative power of the state was invoked, the referendum to be or not to be a part of it as determined by the fundamental law of each state.

If, as we now decide, the term "legislature," as used in art. I, § 4, does not refer to the legislative power of the state, however exercised, but is confined to the members of the legislatures as such and so excludes executive veto, it equally excludes veto by referendum, and both the opinion of congress and the decision in the Hildebrant case, 241 U. S. 565, 36 S. Ct. 708, 60 L. ed. 1173, are wrong.

That case was distinguished in Hawke v. Smith, 253 U. S. 221, 229, 40 S. Ct. 495, 498, 64 L. ed. 871, 10 A. L. R. 1504. An Ohio referendum was again in question. It was held without effect on the ratification by the legislature of an amendment to the federal constitution. The argument that to require approval by referendum was simply one for ratification by the legislative action of the state was considered "fallacious in this—ratification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the State to a proposed amendment."

The Hildebrant case, 241 U. S. 565, 36 S. Ct. 708, 60 L. ed. 1173, was considered "inapposite" because, first, as said there: "Congress had itself recognized the referendum as part of the legislative authority of the State for the purpose stated." (As already shown, congress could not make or unmake the referendum as part of the legislative power of the state for that or any other purpose. The

most it could do was to recognize, as it did by the act of 1911, that it was part of the legislative process in some states.) The court went on to say next [253 U. S. 230]:

"It was held [in the Hildebrant case]  *  *  *  that the referendum provision of the state constitution when applied to a law redistricting the State with a view to representation in Congress was not unconstitutional. Article I, § 4, plainly gives authority to the State to legislate within the limitations therein named. Such legislative action is entirely different from the requirement of the Constitution as to the expression of assent or dissent to a proposed amendment to the Constitution. In such expression no legislative action is authorized or required."

We are dealing now with legislative action. It is established that, if required by a state constitution, the referendum is a part of the legislative process. It must be equally true that, when made so by a state constitution, executive approval and veto are parts of the same process and so not excluded by art. I, § 4.

I cannot concur either in putting aside so easily the argument that there has been a persuasive, if not a controlling, practical construction contrary to the conclusion of the majority. It is always easy for a court to remove a case from the reach of any sort of construction simply by asserting a lack of room for it. The contrary opinion of the court of last resort of our sister state of South Dakota is enough to make a real question. The comment already cited from Judge Story shows that the state ratifying conventions considered that the power concerning times, places, and manner of electing congressmen was left to untrammeled state action, except for the superintending function of congress. The latter was all they objected to.

Without adequate historical search, my impression is that never heretofore has there been serious question that the states have the whole power of legislative action in the matter, except as congress may make its own regulations or alter those of the states. Minnesota is but one of many states (all of them so far as I know) where congressional redistricting has been always by ordinary statute.

The present chief justice of the United States, when governor of New York, expressed himself on the subject of congressional redistricting to an extraordinary session of the legislature in 1907 as follows:

"It is not my purpose to propose a particular plan of apportionment. It is the function of the legislature to formulate such plan and submit it by suitable bill for executive action." Public Papers of Charles E. Hughes, New York, July 8, 1907, p. 52.

Congress has always assumed that congressional redistricting could be by ordinary state legislation, participated in by the executive through the right of veto where required by fundamental state law. That it has considered also that such legislation may be subject by state law to veto by referendum is plain from the act of 1911 and the debates concerning it. 47 Cong. Record, 3436, 3437, 3507.

One thing more. Our legislature thought that it was proceeding in the ordinary way by "A bill for an act," which before becoming effective as law would need approval by the governor unless passed over his veto. As such and not otherwise, it was submitted to him. Only the lower house, after his veto and in default of repassage, ordered the measure filed with the secretary of state. It strikes me that we ought not so far to disregard the intention of our own legislature as to say that its purpose was other or different from what so plainly appears, that is, to enact state law in the ordinary fashion but first to subject it to executive disapproval. So possibly we do not have before us the question that would arise had the legislature intentionally proceeded independently of the governor. The scope of their action they themselves define so plainly as to negative that intention. They attempted only to enact a state law. I question whether we can exempt it from any of the applicable provisions of our state constitution.

As to the substance of the measure, I agree that we cannot hold it a transgression of legislative power. I agree also that the act of congress of 1911 is wholly superseded by the one of 1929.

For the reasons above given, I think that the order appealed from should be reversed.