In the Matter of the Application of SAMUEL S. KOENIG and Others, Petitioners, for a Mandamus Order against EDWARD J. FLYNN, Secretary of State of the State of New York, Respondent.*

Supreme Court, Albany County, November, 1931.

* Affd., 234 App. Div. ——.

*Abraham S. Gilbert* and *Benjamin L. Fairchild,* for the petitioners.

*John J. Bennett, Jr., Attorney-General [Henry Epstein* of counsel], for the respondent.

*John Godfrey Saxe [Robert F. Wagner* and *John J. O'Connor* of counsel], for James A. Farley, chairman of the Democratic State Committee, intervenor.

STALEY, J.   This application is made for a mandamus order directing the Secretary of State to certify in election notices that forty-five representatives in the House of Representatives in the Seventy-third Congress are to be elected in the congressional districts as defined in a concurrent resolution of the Senate and Assembly of the State of New York.

Section 4 of article 1 of the Federal Constitution provides: " The times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the legislature thereof; but the congress may at any time by law make or alter such regulations, except as to the places of chusing senators."

An act of Congress approved June 18, 1929 (U. S. Code, tit. 2, § 2-a), provided for the fifteenth and subsequent decennial censuses and for an apportionment thereunder of representatives in Congress among the several States.   The effect of this census statute and the apportionment made thereunder was an increase in the number of representatives of the State of New York in the House of Representatives from forty-three to forty-five.

On April 10, 1931, the Assembly and Senate, composing the Legislature of the State of New York, passed a concurrent resolu-

tion subdividing the State into forty-five congressional districts, and therein specified and fixed the boundaries of such districts.

This resolution was not in the form of a bill or law. It was not submitted to the Governor of the State for his approval. Subsequent to its passage it was submitted for filing to the Secretary of State.

The Attorney-General has rendered an opinion to the Secretary of State advising him that such resolution is ineffective to accomplish a redistricting of the State into congressional districts, and for the purpose of this proceeding it is conceded that the Secretary of State will refuse to follow this resolution in his certificate for the election of 1932.

The substantial question involved is whether the Legislature of the State of New York has the power to divide the State into congressional districts by a concurrent resolution not submitted to the Governor of the State for his approval, or whether the Legislature was compelled to make such subdivision by an enactment of law subject to the approval of the Governor.

This question compels a consideration of the meaning of the term " Legislature," as used in section 4 of article 1 of the Federal Constitution, of the existence of any enactment by. Congress under its reserved power altering the constitutional regulation, and the extent of executive participation in the law-making power of the State of New York to validate legislative action therein.

" The legislative power of this state shall be vested in the Senate and Assembly." (N. Y. Const. art. 3, § 1.)

Every bill which shall have passed the Senate and Assembly shall before it becomes a law be approved and signed by the Governor, or upon executive disapproval, approved upon reconsideration by two-thirds of the members elected to each house of the Legislature. Any bill not returned by the Governor within ten days, unless return is prevented by adjournment, shall be a law in like manner as if he had signed it. (N.Y. Const. art. 4, § 9.)

This latter section establishes the necessity of executive action of an affirmative or negative character to give the force and effect of law to enactments of the Legislature. It makes the Governor of the State an essential part of the law-making process and power, and establishes the extent of executive participation.

After the census of 1910, the thirteenth census, the Congress in accordance with its custom following every census, passed an act which apportioned the members of the House of Representatives among the several States. This act was approved August 8, 1911, and is referred to as the 1911 Apportionment Act (U. S. Code, tit. 2, § 2). In addition to the numerical apportionment among the

States of the members of the House of Representatives, it contained provision for representatives in certain Territories upon their admission as States before apportionment under the next decennial census; it provided that the districts in each State entitled to more than one representative shall be composed of a contiguous and compact territory and contain as nearly as practicable an equal number of inhabitants; that in case of increase in the number of representatives in any State, such additional representative shall be elected by the State at large, and the others from the existing districts, " until such state shall be redistricted in the manner provided by the laws thereof," and if no change in number from the existing districts, " until such state shall be redistricted as herein prescribed." (§ 4.)

The case of *Davis* v. *Hildebrant* (241 U. S. 565) involved these provisions of the 1911 Apportionment Act in relation to provisions of the Constitution of the State of Ohio granting the right of refer·endum as a part of the legislative authority of that State. This case held that a redistricting act of Ohio for the purpose of congressional elections was properly submitted for validity to the referendum test, when such was duly invoked, because the enactment of Congress requiring that the redistricting should be made by a State " in the manner provided by the laws thereof " compels such procedure.

Whatever the inference of this decision may be, it sustained the power of Congress to so deal with congressional elections. It did not define or establish the method of the exercise of the legislative power of that State to regulate congressional elections under the Federal Constitution in the absence of such congressional enactment, but accepted the act as sufficient justification for referendum submission.

Respondents herein contend that the *Davis* case is controlling here, for the reason that the provisions of the 1911 Apportionment Act are still in effect; that they have not been repealed expressly or by implication and that their requirement " in the manner provided by the laws thereof " is fatal to the method of action by the New York State Legislature reviewed in this proceeding.

With that contention I am constrained to disagree. The act of 1911 was limited by its title to one for the apportionment of representatives " under the Thirteenth Census." Its provisions are limited by express language to procedure required " under this apportionment." It was a temporary enactment designed for a specific purpose which has been performed. Its life has expired. It has been superseded by the apportionment under the 1929 act. Its provisions, limited by its language to the apportionment under

the thirteenth census, has no force or application to an apportionment under the fifteenth census.

The debates in Congress when the 1929 census and apportionment act was considered, in relation to a proposed amendment thereto, which are urged by the Attorney-General as a valued guide to justify judicial determination that the general provisions of the 1911 act are still law, cannot be accorded such force and effect. At best they are mere expressions of opinion of individual members that the general provisions of the 1911 act would still prevail after the enactment of the 1929 act — a view which was rejected. Such expressions are not to be accepted by the courts as controlling or competent aids to establish as law a statute which has ceased to exist under its own limitations.

The inclusion of the general provisions of the 1911 act in the Code of Laws of the United States adopted in 1926 (U. S. Code, tit. 2) does not effect a re-enactment of those provisions.

Section 2 (a) of the act of Congress under which the codification was made (44 U. S. Stat. at Large, 777, chap. 712) provides: " but nothing in this act shall be construed as repealing or amending any such law, or as enacting as new law any matter contained in the Code. In case of any inconsistency arising through omission or otherwise between the provisions of any section of this Code and the corresponding portion of legislation heretofore enacted effect shall be given for all purposes whatsoever to such enactments."

Hence there exists no congressional regulation which alters the power of the Legislature of each State to prescribe in a proper and legal manner the times, places and manner for holding elections for representatives in Congress.

The word " legislature " as used in section 4, article 1, and other sections of the Federal Constitution, has been the subject of judicial construction by State and Federal courts.

In *State ex rel. Smiley* v. *Holm* (—— Minn. ——; 238 N. W. 494), a recent case, it was construed as meaning the representative body which makes the laws of the State, not synonymous with the law-making power of the State and not including constitutional participation by the Governor of that State. Upon this holding an act of the Legislature of Minnesota, vetoed by the Governor providing for congressional redistricting, was declared valid.

In *State ex rel. Schrader* v. *Polley* (26 S. D. 5) it was given a contrary construction and there held to include the whole constitutional law-making power of the State and subject to the referendum vote of the people and not limited simply to the members who compose the Legislature. It was further held in this case that a State in its sovereign capacity possessed the power to regulate

elections therein; that section 4 of article 1 of the Federal Constitution was not a grant but a recognition of that power, subject, however, to the reservation of a power of Congress to establish regulations in relation to congressional elections and to that extent circumscribing the legislative authority.

In *Hawke* v. *Smith, No. 1* (253 U. S. 221) the term " legislatures," as used in article 5 of the Federal Constitution in respect to the ratification of amendments to the Constitution, was held to mean the deliberative representative bodies that make the laws of the people for the respective States, and that the ratification of a proposed amendment to the Federal Constitution by the Legislature of a State is not an act of legislation but is the expression of the assent of the State to the proposed amendment.

The opinion of Mr. Justice DAY, referring to the meaning of " legislatures," as used by the framers of the Constitution in requiring " ratification " of amendments, says: " That was not a term of uncertain meaning when incorporated into the Constitution. What it meant when adopted it still means for the purpose of interpretation. A Legislature was then the representative body which make the laws of the people. The term is often used in the Constitution with this evident meaning."

These expressions have been seized upon as justification for the exercise by Legislatures of an independent power, unlimited by State constitutional requirements, to establish congressional districts in the State. The decision in this case and the expressions of the opinion may be regarded as the prompting genesis of the concurrent resolution herein involved. At least they are asserted as authority for its validity.

It is significant that the opinion in this case in its reference to the portions of the Federal Constitution, where the term " legislature " is used with this evident meaning, does not include section 4 of article 1 of the Constitution. That a view was entertained that a different meaning should be ascribed to the term as used in section 4 of article 1 is plainly indicated by reference in this opinion to the case of *Davis* v. *Hildebrant*, in relation to which it said: "Article 1, section 4, plainly gives authority to the state to legislate within the limitations therein named. Such legislative action is entirely different from the requirement of the constitution as to the expression of assent or dissent to a proposed amendment to the constitution. In such expression no legislative action is authorized or required."

The recognition of the difference in the method of functioning by the Legislature where it exercises or did exercise the power of choosing a United States Senator, of ratifying or rejecting a pro-

posed amendment to the Federal Constitution, of being bound by oath to support the Constitution of the United States and that of " prescribing " the districts in a State from which representatives in Congress shall be elected, is, I believe, the key to correct interpretation. The nature of the function delegated to the Legislature for performance affects and determines the methods of its action.

Legislative action has been frequently designated in judicial opinions as " legislative authority," " legislative power " and " the law making power."

A clear distinction exists between action, which in the very nature of things must be taken by votes of the members of the Legislature, and action taken by legislative authority. In the latter case there must be an exercise of the law-making power, and in this State the Governor, as well as the members of the Legislature, is an essential part of that power.

When the Legislature is granted the power to prescribe, it means that the Legislature will do so by the exercise of its legislative power and the exercise of that power to be effective must be in accord with all the law-making essentials.

In the State of New York the Governor is an essential factor in the process. Judge CARDOZO in the recent case of *Matter of Doyle* (257 N. Y. 244, 261) said: " It is not the sole custodian of that [legislative] power. The power is divided between the Legislature and the Governor * * *. The Legislature can initiate, but without the action of the Governor it is powerless to complete."

Until this year the settled practice of all the States, so far as research has been able to determine, has been uniform in the method of establishing congressional districts by law enacted in the manner required by the law-making process of each State. Such action for nearly a century and a half furnishes a practical construction of the method of performing this function of persuasive, if not controlling and conclusive weight. Common usage and practice indicating a particular interpretation of a constitution or statute is of great value in determining its real meaning.

" We do not readily overturn the settled practice of the years." (*Story* v. *Craig*, 231 N. Y. 33.)

" The framers of the Constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids to interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text; but where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight. * * * The construction to which we have referred has prevailed too long and been too uniform to justify us in inter-

preting the language of the Constitution as conveying any other meaning than that heretofore ascribed, and it must be treated as decisive." (*McPherson* v. *Blacker*, 146 U. S. 1, at pp. 27 and 36.)

Two views completely divergent of the meaning of the term " legislature " as used in section 4 of article 1 of the Federal Constitution are presented by the decisions of the Supreme Court of South Dakota and Minnesota. Such a difference of view by high judicial authority opens the door for resort to the uniform practice which has prevailed since the Constitution was established as a guide and authority for decision.

The force of custom, practical construction and usage should not at this late day yield to judicial interpretation of a term, declared in relation to the performance of a public function, which must, in the very nature of things, be performed by the individual choice and views of the members of the public body to which it is committed, when attempted to be applied to such body in the performance of a task which involves and reflects deliberate action by a State.

The construction of the requirement of the constitutional provision in the method of congressional apportionment, as evidenced by the many laws of the States, so long practiced and acquiesced in, should not be upset and governmental processes thrown into confusion because the executive will not approve a congressional apportionment as enacted by the Legislature or the Legislature will not enact one which will receive executive approval.

Order may be entered denying the application for mandamus order, without costs.