WOOD, SECRETARY OF STATE, *v.* STATE *ex rel.* GILLESPIE, DISTRICT ATTORNEY.

(In Banc. July 5, 1932.)

[142 So. 747. No. 30207.]

Greek L. Rice, Attorney-General (by W. H. Watkins, Special Assistant Attorney-General), for appellant.

Hugh V. Wall, of Brookhaven, J. H. Price, of Magnolia, J. O. S. Sanders, and Chalmers Potter, both of Jackson, W. S. Henley, of Hazlehurst, R. L. Jones, of Brookhaven, and P. C. Canizaro, of Vicksburg, for appellee.

Per Curiam:—A petition for a writ of mandamus was filed by the district attorney, attacking the validity of the congressional redistricting act of the Legislature of 1932, under House Bill No. 197. The basis of the attack is that the third and seventh congressional districts as laid out in said act do not conform to the provisions of section 3,

chapter 5, Act of Congress 1911, 37 Stat. 14 (2 U. S. C. A., sec. 3), which requires or directs that the several districts shall be composed of a contiguous and compact territory and containing as nearly as practicable an equal number of inhabitants. The prayer of the petition is that appellant, as secretary of state, shall be compelled by a mandate of the court to disregard, in his preparation of the sample ballots to be used in the November, 1932, election, any designations of candidates for congress by districts, and should be ordered to prepare said ballots for said candidates only as candidates from the state at large. Appellant demurred to the petition, the demurrer was overruled, and the mandate was issued as prayed in the petition.

We have therefore fully before us everything that was before the trial court, and, as these are questions of law only, we must reverse the judgment and dismiss the petition on three grounds, which we will now state.

The first ground is upon the established rule that a writ of mandamus will not issue unless and until there has been actual default in the performance of some duty required of the defendant. There is no allegation in the petition in this case that there has been a demand on the secretary of state to perform any duty required of him; neither is there such a showing in the petition as to put the case within the rule that where a public duty to do or not to do a certain thing is enjoined by law upon a public official, and the matter is of public interest, the refusal or failure to act in the premises on the part of the official is of itself a demand and refusal, that by his own failure to perform the duty the demand has been made and refusal presumed. The fact is that this court judicial'y knows that on the 23rd day of August, 1932, a primary election is to be held in this state for the election of Congressmen, Supreme Court judges, and highway commissioners, and that in event a second primary is necessary the further election is fixed by law to be held on September 13, 1932. See section 5870 of the Code of

1930. These two elections must be held before the secretary of state is required to perform any act for which mandamus is sought in this case.

Section 6231, Code of 1930, provides that the ballot to be used in the general November election shall contain the names of all candidates put in nomination not less than fifteen days previous to the day of the election by the primary election of any political party. Likewise it is provided that the name of any qualified elector who has been requested to be a candidate by written petition, signed by a requisite number of electors not less than fifteen days before the election, shall be printed on the ballot. At that time, and when the names of the candidates by either of the methods have been made known to him, it is the duty of the secretary of state, with the approval of the governor, to furnish the ticket commissioners of each county with a sample ballot. We judicially know that the general election of this year in which congressmen and the other officers named are to be elected will be held on Tuesday, November 7th, and that prior to the antecedent fifteen days it cannot be legally known by any official connected with the election or the secretary of state as to the names that shall be printed on the sample ballot. It then is evident that the secretary of state is not required to perform any duty with reference to the elections complained of in this petition for mandamus until within fifteen days of the 7th day of November next.

In virtue of section 6234, Code of 1930, the secretary of state is not empowered to furnish sample ballots unless and until the governor of the state has approved the same. The duty sought to be imposed upon the secretary of state is not to be performed until some day subsequent to the 21st day of October, 1932. The relator in this case filed his petition for writ of mandamus in the circuit court on the 21st day of June, 1932, and this case has already been submitted in this court practically four months in advance of the time when the secretary of

state is called upon or required by law to perform any duty with reference to the general November election. Certain it is then that an election must be had by the political parties, and the result thereof certified, and the opportunity given a candidate who desires to run upon petition of electors. The governor must approve the ballot before the secretary of state is called upon to discharge any duty relative to the matter here in controversy.

Section 2348, Code of 1930, is authority for the writ of mandamus in this state, and provides that the writ ''shall be issued by the circuit court, commanding any inferior tribunal, corporation, board, officer, or person to do or not to do an act the performance or omission of which the law specially enjoins as a duty resulting from an office, trust, or station,'' etc. The gist of the mandamus in this case is to prohibit the secretary of state from making up the ballot. He cannot make up this ballot without the approval of the governor. This act of the governor is a prerequisite to the discharge of the main function of the secretary of state in this behalf. This mandamus does not attempt to reach the governor. In fact, the governor cannot by compelled by mandamus to perform any act. See Vicksburg Ry. Co. v. Lowry, 61 Miss. 102, 48 Am. Rep. 76, in which case Chief Justice CAMPBELL said: ''Can a mandamus be issued to the governor in any case? It has been held by some courts that the governor may be compelled by mandamus to perform ministerial acts; but the overwhelming weight of authority is in favor of the denial of the writ against the governor in any case. In Arkansas, Georgia, Florida, Illinois, Louisiana, Maine, Michigan, Minnesota, Missouri, New Jersy, Rhode Island, Tennessee, and Texas, it is held that mandamus cannot be issued against· the governor, and the decisions are supported by the most satisfactory reasons arising from the nature of our government, which consists of distinct departments which are independent and must be so maintained. Hawk-

ins v. Governor, 1 Ark. 570 (33 Am. Dec. 346); [State ex rel.] Bisbee v. Drew, Gov., 17 Fla. 67; Low v. Towns, 8 Ga. 360; People v. Bissell, 19 Ill. 229 (68 Am. Dec. 591); People v. Yates, 40 Ill. 126; State v. Warmoth, 22 La. Ann. 1 (2 Am. Rep. 712); In re Dennett, 32 Me. 508 (54 Am. Dec. 602); [People ex rel.] Sutherland v. Governor, 29 Mich. 320 (18 Am. Rep. 89); Rice v. [Austin] Governor, 19 Minn. 103 (Gil. 74), (18 Am. Rep. 330); State v. [Fletcher] Governor, 39 Mo. 388; [Opinion of court in response to] Inquiries of Governor, 58 Mo. 369; State v. Governor, 1 Dutch. (25 N. J. Law) 331; Mauran v. Smith, 8 R. I. 192 (5 Am. Rep. 564); Turnpike Co. v. Brown, 8 Baxt. (Tenn.) 490 (35 Am. Rep. 713); Houston Railroad Co. v. Randolph, 24 Tex. 317.'' So that the judgment in mandamus in this case creates the anomalous situation that the governor of the state may approve the official sample ballot while the secretary of state will be prohibited thereby from receiving the ballot and sending it out. This but demonstrates, in our judgment, the futility of granting the writ of mandamus in this case.

It appears to be quite well settled that mandamus will not lie when the act is only to be done in case another party approves thereof. See Merrill on Mandamus, p. 66, sec. 58. It being perfectly obvious that the secretary of state has not in any way failed to discharge any duty, nor has he had the opportunity to fail, nor can it be presumed that he will fail to discharge any duty enjoined upon him by the law, how, then, can it be said that a suit may be instituted against him and a judgment entere l that he shall perform a duty long prior to the time when he is called upon to act? The cause of action must exist at the date of the filing of a petition for mandamus; that is elementary with reference to mandamus and all other suits, except perhaps injunction suits against threatened invasion of the complaining party's rights.

In the case of Anderson v. Robins, 161 Miss. 604, 137 So. 476, this court held that mandamus will lie only to

require the performance of an official duty that an officer has refused to discharge, and cited High, Extr. Legal Rem. (3 Ed.), sec. 385; 38 C. J. 579.

In the case of State v. Board of Sup'rs of Coahoma County, 64 Miss. 358, 1 So. 501, 505, this court held that mandamus to compel the proper authorities to hold an election to locate the county site of Coahoma county, where the election was to be held in August and petition was presented on January 8, 1887, would not lie, as it would be presumed that when the time came the proper authorities would discharge their duty. Judge CAMP-BELL therein said: "It is not to be assumed, and on that assumption to base a judicial proceeding, that the body charged with a duty under this act will not perform it at the proper time. A presumption must be indulged that duty will be performed."

The citation of these two authorities from our own court would seem to be sufficient to settle the case, but there is an abundance of authority, in fact it is elementary, that a mandamus will not issue against a public official in advance of and before the time arrives when that official is required to perform a duty. A demand cannot be legally made upon him to perform a duty which is impossible of performance at the time of the demand. The secretary of state could not now print a ballot, nor could he assume for that matter anything relative thereto; and, if it be conceded for the sake of this opinion that the apportionment act complained of with reference to the election of congressmen in this state is void, it cannot be assumed or presumed that the governor of the state will violate the plain law, or that the secretary of state will likewise, if the governor violates the law, so ignore the Constitution and acts of Congress.

A demand cannot be made before the time has expired wherein the officer is allowed to do the act, in th's case fifteen days before the 7th of November next. See Merrill on Mandamus, section 226. There is neither refusal to act nor conduct equivalent to a refusal in the case

at bar. "Mandamus is never issued unless the respondent is in default in the performance of his duty . . . It will not be issued in anticipation of such failure, but he must be in actual default. It is immaterial how strong the presumption may be that the party at the proper time will refuse to perform his duty. No threats or previous determination not to perform his duty will take the place of an actual default." See Merrill on Mandamus, section 221. Also, 38 C. J., p. 581, and 18 R. C. L., p. 122.

In the Coahoma county case, supra, the board of supervisors had actually passed a resolution that they would not perform the duty of ordering an election in anticipation and before the time when the duty was to be performed, and this court said that mandamus would not lie. See, also, L. R. A. 1917F, 221, and the annotations under the head "Mandamus to compel steps preliminary to an election before the arrival or expiration of the time fixed therefor."

A writ of mandamus is never granted to take effect prospectively. Spelling, Inj. and Extr. Rem., sec. 1385; High, Extr. Legal Rem. (3 Ed.), sec. 1236; Tapping, Mandamus (10 Am. Ed.), p. 63; Wood, Mandamus (2 Ed.) 51.

In the case of North Carolina Public Service Co. v. Southern Power Co. (C. C. A. 4), 282 Fed. 837, 840, that court said: "The office of mandamus is to compel the performance of a plain and positive duty. It is never granted in anticipation of an omission of duty, but only after actual default. Injunction is the proper remedy for threatened violation of a duty, entailing an injury for which the law gives no adequate compensation. Board of Liquidation v. McComb, 92 U. S. 531, 23 L. Ed. 623; In re Cutting, 94 U. S. 14, 24 L. Ed. 49." In the case at bar there is not even threatened injury.

The duty must exist at the time the application for mandamus is made. In United States v. Lamont, 155 U. S. 303, 15 S. Ct. 97, 98, 39 L. Ed. 160, Chief Justice

WHITE said: "The duty to be enforced by mandamus must not only be merely ministerial, but it must be a duty which exists at the time when the application for the mandamus is made. Thus in the case of Ex parte Rowland, 104 U. S. 604 [26 L. Ed. 861], this court, speaking through Mr. Chief Justice WAITE, said: 'It is settled that more cannot be required of a public officer by mandamus than the law has made it his duty to do. The object of the writ is to enforce the performance of an existing duty, not to create a new one.'"

We must desist from the citation of authorities. If there is any one principle of law settled in this state and nation it is that mandamus will not lie until default is made in the performance of a duty constituting the gravamen of the complaint; and the facts of this case cannot bring it within any exception to the general rule. The secretary of state has violated no duty. The courts of this state are powerless to make him perform a duty not now enjoined upon him by the statutes or otherwise. To allow the issuance of the writ of mandamus would be to create a new duty, and a different duty, and would put the officer in default, tax him with costs, put him to the expense of litigation, and adjudge him to be remiss and defaulting in the performance of a duty nearly four months in advance of the time when he is required to act. In such a case it is extremely unwise for the court to open the gates wide to the flood of vexatious litigation which would most likely ensue. This is by no means technical; it is elementary law everywhere.

In closing the opinion on this point we may mention that stress was laid, in argument, on the fact that the Supreme Court of the United States considered the cases of W. Yale Smiley v. Mike Holm as Secretary of State of Minnesota, 284 U. S. 616, 52 S. Ct. 266, 76 L. Ed. —; Samuel S. Koenig et al. v. Edw. J. Flynn, Secretary of State of State of New York, 52 S. Ct. 403, 76 L. Ed. —; and John J. Carroll v. Chas. U. Becker, Secretary of State of Missouri, 52 S. Ct. 402, 76 L. Ed. —,

and that in these cases the remedy by mandamus was inferentially recognized, because the point was ignored. In the case at bar, the point was sharply presented by the demurrer in the court below, and is forcibly argued here; the only answer thereto being an oral argument to the above effect.

In State v. Holm, supra, it is clear from the statement of the case in 184 Minn. 228, 238 N. W., at page 494, that the secretary of state had been called upon, and had refused, to file nominations for the office of congressman, by accepting some filings, and refusing those who sought to be candidates at large. This case clearly shows a demand and refusal, and an alleged default of duty, and is the same case appealed to the United States Supreme Court.

In Carroll v. Becker, Secretary of State of Missouri, supra, it appears that the time had arrived for the secretary of state to file declarations of candidates for Congress, as disclosed by the report of that case from the Supreme Court of Missouri, found in 45 S. W. (2d) 533, so that we are warranted in saying that there was demand and refusal to perform a duty on the part of the official at a time when he was called upon to act. The statement of fact is that the secretary of state refused to receive or file a relator's declaration.

In Koenig v. Flynn, supra, the facts will be found in 141 Misc. 840, 253 N. Y. Supp, pages 554, 556, wherein it is disclosed that the attorney-general had rendered an opinion to the secretary of state that a resolution was ineffective to accomplish a redistricting of the state into congressional districts; and to use the language there found: ''And, for the purpose of this proceeding, it is conceded that the secretary of state will refuse to follow this resolution in his certificate for the election of 1932.'' This statement of facts clearly recognizes the point of law here decided, and a waiver thereof by the respondent in that case.

We conclude, therefore, that no one of the three cases,

cited supra, militate in the slightest degree against the rule of law which we have herein announced.

In the second place, a writ of mandamus will not issue if in ultimate effect it will be nugatory or incomplete, and if its effect in respect to the public will be to introduce serious doubt or confusion or irremediable controversy into those public questions which the writ is invoked to settle. These are fundamental principles in respect to the remedy by mandamus. It is apparent that the writ is sought here in order to attempt to control the party primaries of the democratic party in August, 1932, so as to make these primaries statewide, and in disregard of congressional districts, and with the fact in full view that nominations by that party in this state are inevitably followed by the election of the nominees in the election in November. All will concede that courts have no jurisdiction over party political matters. True, these party primaries are regulated by statute, and courts may inflict criminal punishment for offenses against these laws, but the courts have no jurisdiction to direct how the party authorities shall act in the administration of the party machinery under the primary election statutes.

The statutes on primary elections are absolutely silent on any such proposition as the nomination of candidates for Congress from the state at large. Two sections only of the statutes on primary elections deal with nominations for congressmen. These are sections 5870 and 5900, Code of 1930, and both of these sections require that these candidates for Congress shall be nominated by districts. There is no allowance anywhere in the primary election statutes that congressmen may be nominated by the state at large. True it is that these statutes may be taken as having presupposed a valid congressional districting act as resting in the general election laws. But suppose the majority of this court should conclude that it has the judicial power, and that it should exercise that power, to declare the 1932 congressional redistricting act to be absolutely void because

in contravention of the federal statute on the subject; this would take the act out of the general election laws, but would still leave the primary election statutes stand· ing untouched, that party nominations for congressmen shall be by districts; for all must concede that federal statutes have nothing to do, and can have nothing to do, with party primaries and party nominations within a state. Federal statutes may deal with elections, but not with the internal affairs of a state in respect to the political party machinery in that state, and which deal with party nominations, not with the. elections themselves. Newberry v. United States, 256 U. S. 232, 41 S. Ct. 469, 65 L. Ed. 913, 921.

So that if we were to declare the state redistricting act of 1932 invalid as a part of the general election laws and of no more effect as a general election law than if never passed, because obnoxious to the federal statute, there would still remain the provisions in the primary election laws that the nominations for congressmen shall be made by districts, and we repeat that the provisions aforesaid would remain in the primary election statutes because congressional laws have no sort of force or effect in regard to primary elections within a state. Would it not then be the duty of the state democratic executive committee to immediately assemble and to carry out the primary election statutes, order the nominations of congressmen by and from districts, the nominees to be voted on at the general election by the state at large? And as Congress has no power or authority over primaries or over statutes relating to primaries, and in so far as state statutes are applied to primaries, would not the said state executive committee be authorized to hold and to declare that the said state districting act is valid and observable so far as the party primary elections are concerned, and so far as concerns the selection of party candidates by and from districts; these to be certified for the general election as candidates of the party at large? We would hold in the affirmative on the

questions put if the same were judicial questions, but
if not judicial questions, then if the supreme committee
of the party were to so assemble and order, what power
would there be in any court to stop them or order other-
wise? Absolutely none in any court. We do not know
what the supreme authorities in the party would do, in
the respects above mentioned, and it is none of our
business, nor is it the business of any judicial court. We
only mention what they could do, and, so far as we know,
would do. And if they should do this, and should certify
the nominees to the secretary of state, to be placed on
the ticket from the state at large, he could and would
do so, under the mandate issued from this court ordering
him to place the congressional candidates on the general
election ticket as candidates from the state at large, and
thus the said mandate would have become, in its ultimate
effect, nugatory, without substantial effect, and, instead
of being of any use, would be merely a judicial scare-
crow.

And suppose that when the supreme executive com-
mittee of the state should meet and order the primary
election for congressmen to be held by and from dis-
tricts, but for the state at large, some of the county execu-
tive committees would proceed to obey the order, and
so print and distribute the primary election tickets,
while other county executive committees would chal-
lenge the authority of the supreme executive committee,
and these county executive committees would upon their
own authority proceed to print and to distribute the
tickets from the state at large, what confusion, doubt, and
irremediable controversy would thereby result? And
absolutely irremediable, because no court would have the
jurisdiction and power to intervene.

We do not need to press the discussion upon this sec-
ond point further. It can be approached from numerous
other angles, but all lead out at last to the unwisdom,
the futility, the violation of fundamental principle, in
courts being called upon to intrude into matters which

resolve themselves at last into issues which are political, and which in the final analysis would be an infringement by the courts upon liberties reserved to the people to be exercised by them through their own party associations, and according to their own party rules.

In the third place, and even if the insurmountable obstacles heretofore mentioned did not exist, we would be obliged to refuse the writ in this case because to allow it would, to use a brief and common phrase, do more harm than good; it would be to subvert that which has been a dominant and paramount consideration for nearly one hundred years in the election of congressmen, namely, the selection of these officers from districts, and to attempt to destroy the district representation unless and until the secondary and inferior consideration that these districts shall be equal in population shall be observed according to a strict rule of judicial measurement. For nearly one hundred years it has been the settled policy and practice to select representatives in Congress from districts, and this has grown as a necessity out of the obvious fact that the different sections of the state have their own particular and peculiar interests and needs in national legislation and in national aid. This is strikingly illustrated in our own state by the Delta district wherein the paramount interest and need is in flood protection and in river matters, whereas the people in the northeastern district of the state have no immediate interest in those problems, except as all people in the entire nation are interested therein. In 1842 Congress provided that representatives in Congress should be elected from districts, and between 1842 and 1872 provisions were inserted in the congressional act that the districts should be contiguous and compact, and it was not until 1872 that for the first time a further provision was made that each district in the state should contain as nearly as practicable an equal number of inhabitants. No complaint is urged against the redistricting act on account of contiguity or compactness, but the attack is

because of inequality of inhabitants. It is shown that the districts in that respect are as follows: First district, two hundred fourteen thousand seven hundred five; Second district, two hundred nineteen thousand six hundred sixty-one; Third district, four hundred two thousand nine hundred sixty-nine; Fourth district, one hundred eighty-four thousand two hundred sixty-six; Fifth district, two hundred forty-four thousand five hundred sixty-two; Sixth district, two hundred eighty-four thousand five hundred forty-seven; Seventh district, four hundred fourteen thousand three hundred one. It is apparent upon the face of the stated figures that there is an inequality of inhabitants; but there has been an inequality in this respect in every congressional districting act that has been passed in this state, going back even to the beginning. And this has not been the case only in this state, but has prevailed in nearly all the states. For instances: The state of Alabama has one district with two hundred fifty thousand inhabitants, and another with four hundred fifty thousand; the state of California has one district with one hundred sixty-five thousand inhabitants, and another with three hundred fifty thousand; Michigan has one district with two hundred twenty-five thousand, and another with four hundred thousand; Missouri, under a previous redistricting act, had one district with one hundred fifty thousand, and another with five hundred twenty thousand; South Dakota has one district with two hundred thousand, and another with six hundred fifty thousand; Pennsylvania has one with one hundred twenty-five thousand, and another with four hundred forty-five thousand; Ohio has one with one hundred sixty-eight thousand, and another with six hundred thirty-four thousand; Tennessee has one with one hundred ninety-five thousand, and another with three hundred eighty thousand. These facts show that the matter of equality of inhabitants has by long and general practice been regarded both by the states and by Congress as a subordinate or secondary question, and that

the paramount and controlling consideration has been to create districts in which homogeneity in national interest and needs shall be preserved, rather than to be bound by a strict judicial rule of equality in number of inhabitants.

We are not confronted here with a situation wherein there has been a mere pretense towards the creation of congressional districts, as would be the case, for instance, if the Legislature had taken only one or two counties or even three and made one congressional district of them, and so on for six districts, and had then placed the remainder of some fifty or sixty counties into a seventh district. This would be so far a mere pretense and fraud as to demonstrate that the paramount requirement of districts as substantial and homogeneous units had been utterly flouted and subverted. But here there has been the substantial creation of fairly compact and homogeneous districts, and, while we regret the inequality of population, we must in approaching this question do so as judges, and not as legislators, nor as individuals, and in doing so we must broadly look to the whole state and to all its parts and sections and to the ultimate interests of all the people of the state who in the vast majority have had no direct part in, or connection with, this particular piece of legislation. We are thus confronted with the plain and obtrusive question whether by a mandate from this court, if such a mandate could be made effective, the districts and the district interests shall be allowed to be destroyed, the dominant practice and policy of nearly a century's duration shall be reversed, and in lieu thereof the representatives shall be elected from the state at large without regard to districts or the interests of the people of the state in the preservation of district representation.

It is not necessary for us to dwell upon the important necessity that representation in the lower house of Congress, in this day and time of a vastly increased population and of the complexities and varieties of national activities, shall be elected by districts, and that each section

shall be represented by a person closely familiar with the people in that section and district; with their habits, desires, aspirations, and problems. Under a statewide nomination it would be possible that broad sections of the state would find themselves without immediate or direct representation, while another section or territory might by the chances of practical politics or the influences of sectional resentments absorb the entire membership from this state in the said lower house.

And this is not the only consideration. The people of this state in their present condition of economic distress have been wearily, hoping to be permitted to remain for a while in a condition of comparative political peace, and to avoid any such strife and turmoil and such inevitable bitterness as would be introduced and engendered by a state-wide struggle just now by a field of candidates, so large that the people and their more important interests would be engulfed in a maelstrom of politics, and at the most unhappy time in many years of their history.

In such a situation it seems to us that the interest of the general public should and must be the paramount and controlling consideration upon the question of the issuance of a writ of mandamus; and that our duty, acting in behalf of the people of the whole state, as we must act here, requires us to refuse the writ when the interest of the public at large, every portion of the state considered, would be detrimentally affected. Mandamus is a discretionary writ, and, even in cases where an abstract legal right is shown, the writ will be withheld whenever the public interest would be adversely affected. This is the law where private property rights, and other private juridical rights, are involved, but even stronger is the rule when, as is the case here, no private right is asserted, but only the public political rights of those for whom the petition is filed, in which latter case the writ will not issue to enforce a public right when in fact it

will operate to the detriment rather than to the benefit of the general public. 18 R. C. L. 138, 139; 38 C. J. 550.

The rule above stated is thoroughly settled in this state. In the case of Effingham v. Hamilton, 68 Miss. 523, 10 So. 39, in an opinion by Judge CAMPBELL, and when the personnel of our court was perhaps the strongest in all its history, the court said: "But it is not in every case of clear legal right, and the absence of a sufficient legal remedy, and where, therefore, mandamus is an appropriate remedy, that it was be issued. It is settled by numerous decisions that a sound judicial discretion is to be used, and, where circumstances make it unwise and inexpedient to allow this writ, to refuse it when sought to enforce merely private right." And the court then goes on to show that the petitioners had a clear legal right, and that their contract was a valid legal contract and should be protected in some form; nevertheless, because of the situation into which the affected public had been brought and although by no fault of the petitioners, the court concluded that, "In view of these complications, and the evil consequences likely to arise affecting public interest, we deem it proper to deny the remedy sought;" and the court went on further to say that the private rights there involved were entitled to protection and enforcement in proper cases, yet these rights "must be subordinated to the public interest as to the particular remedy (mandamus) here invoked." This case was reviewed and the holding reaffirmed in Bogan v. Holder, 76 Miss. 597, at page 607, 24 So. 695, 697, wherein the court said: "The writ of mandamus is not strictly one of right. Our code has assimilated the action of mandamus to other ordinary actions, but the courts may still grant or deny the writ according to the circumstances of the case."

Such being the settled law in this state in respect to private property rights, how much more strongly must and does the rule run when the petition is for the enforcement of an asserted public right, and when the

court, looking to all the circumstances and to the entire body of the public to be affected, can clearly see that the "circumstances make it unwise and inexpedient to allow the writ;" that more of the public, a greater part of the public, will be definitely affected adversely than would be the abstract benefit to some other and smaller parts of the same body of the public. As we have already said, the vast majority of the people of this state have been void of any offense or of any part in this congressional redistricting act. To punish this large majority in depriving them of their district representation in the national Congress, in order to right a wrong to a minority, would be to right a wrong by doing another wrong, and this we do not conceive to be any part of the functions or office of a writ of mandamus, which in such a case as this is not only discretionary but is issued upon principles which are equitable, and this means that it must be equitable as to all concerned and to be affected thereby, not that it shall be equitable only as to a smaller part when at the same time it would be unjust to the greater part of our public body in this state. The argument for the petitioners here is that in order to cure a felon on one finger we shall cut off the hand.

Having reached the conclusion that the writ of mandamus should not and cannot equitably be issued in this case, we need not, as an entire court, go further and decide whether the issues presented in respect to the validity of said congressional redistricting act are political issues resting solely within and between the legislative branches of the state and federal governments, or whether judicial; and whether, if judicial, the question is one solely for the determination of the federal judiciary and with which state courts have utterly no concern, as was held in Richardson v. McChesney, 128 Ky. 363, 108 S. W. 322, 129 Am. St. Rep. 299. We need not decide whether the act of Congress in respect to the number of inhabitants in each district is mandatory or directory, or wheth-

er, if mandatory, the only correcting authority is Congress itself. All these and the other interesting and far-reaching questions raised in this case are therefore pretermitted, except as discussed by the judges each for himself, and we rest our action upon the solid founda tion of the settled law in respect to the character and applicability of the writ of mandamus, and for the reasons in that regard which we have heretofore outlined.

Reversed, and petition dismissed.

**Ethridge, J.,** delivered a specially concurring opinion.

The per curiam opinion, in which I fully concur, decides all that is necessary to dispose of this case. But, in view of the public interest, and the desirability of knowing the law pertaining to the merits of the case, and following the precedent of Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60, I desire to submit the following views.

The basis upon which the mandamus in the case at bar is sought is that the redistricting act is void because of inequality in population in the several districts, and because it is in conflict with section 3 of the Act of Congress of August 8, 1911 (2 U. S. C. A., sec. 3), reading, in part, as follows: ''In each state entitled under this apportionment to more than one representative, the representatives to Congress shall be elected by districts composed of contiguous and compact territory, and containing, as nearly as practicable, an equal number of inhabitants. The said districts shall be equal to the number of representatives to which such state may be entitled in Congress, no district electing more than one representative.'' 37 Stat. 14.

By an analysis of this statute, it will be seen that it is directory, and especially as to the feature directing districts to be contiguous, compact, and of nearly equal population. Congress itself did not undertake to create districts, nor did it undertake to prohibit a variance of

more than a given number of inhabitants in each district, so that there is no statement by which the judiciary can measure what will be an equal number of inhabitants, or what would constitute a compact territory.

The one mandatory feature, if it can be said to be mandatory, is that the election be by districts, and that no district shall elect more than one representative. It was clearly the dominant purpose and desire of Congress that the election should be by districts, and that there should be as many districts as representatives allowed the state in Congress. The number of representatives is fixed by the congressional act, and to grant a mandamus, or declare the act void, would be to thwart the dominant purpose of Congress in directing the state to be divided into districts. It is true that if Congress had desired to enact in detail and by specified territory and population how districts should be laid off, it could have so done, but as Congress did not express its own judgment as to what territory should compose the districts, or what population each district should contain, it necessarily left it to the legal discretion and judgment of the state Legislature as to what constitutes a contiguous and compact territory, and, the discretion being so left by an act of Congress, this court cannot control that discretion. It cannot substitute its own judgment for that of the legislative body. It seems to me that there can be no doubt about the act being directory. Hubbert v. Campbellsville L. Co., 191 U. S. 70, 24 S. Ct. 28, 48 L. Ed. 101; French v. Edwards, 13 Wall. 506, 20 L. Ed. 702; 2 Words and Phrases, Second Series, 53; Lang v. Harrison County, 114 Miss. 341, 75 So. 126; Rosenstock v. Board of Sup'rs of Washington County, 112 Miss. 124, 72 So. 876. It is clearly directory in reference to the kind of districts that shall be created.

We know that, in dealing with subjects of this kind, there are many factors entering into the minds of legislators in creating districts. However much we might be

812

disposed to differ with the Legislature as to the propriety and wisdom of the act, it is a question for the Legislature itself to determine, and the court will not undertake to control the Legislature in its respective separate department of state government.

It is to be regretted that there is considerable inequality of population, but no one believes that any district can be created that is absolutely equal in population and shape to every other district. This state has never had such a system of districts, nor has any other state been able to lay off congressional districts with exact equality as to size, shape, and population.

We should subordinate the secondary considerations of the act to the primary or dominant ones. It is clearly more desirable that there should be districts than that they should be equal. In our own state, for instance, on the west boundary is the great Mississippi river country subject to overflow, much of the territory of the state lying within the area so subject. Levee protection is the chief benefit of government to this area. They might subordinate other things to flood protection. A portion of the state borders on the Gulf of Mexico, and is interested in port improvement and commercial enterprises. Other sections of the state, removed from rivers and harbors, have no particular interest in such projects, being chiefly engaged in other pursuits. Each group having one representative is represented more than it would be if congressmen shall be elected from the state at large. Under the bill as drawn, each district of the state is assured of one representative to speak for it in the national House of Representatives. Should the circuit court be followed, this assurance will be destroyed, as all the congressmen might be elected from one territory to the great detriment of the rest of the people of the state.

No doubt the Legislature gave much time to the consideration of this redistricting bill. It seldom happens that everybody can be pleased. The journals show a

number of bills were introduced, having different divisions of territory and population from the one under review. This shows a diversity of opinion in the Legislature on the subject. For this reason also, I think the public interest can be best served by not disturbing its finding. There was no state constitutional restriction upon the Legislature in creating districts, and therefore the Legislature was in full possession of power and discretion vested in it by section 4, article 1, United States Constitution. The Constitution having given Congress the power to make laws and alter laws, by implication, necessarily excludes every other power than Congress from disturbing what the state Legislature has enacted. Neither the state nor the Federal Constitution imposes any restriction upon how the state shall act in the matter, nor of how Congress shall act upon the matter, except that it shall act in the exercise of the lawmaking methods, and its regulations must be lawful. Expressio unius est exclusio alterius. This maxim is of universal statutory construction. United States v. De la Maza Arredondo, 6 Pet. 691, 8 L. Ed. 547. When an expression is used in a general statute, it excludes all other than this expression. Kendall v. U. S., 107 U. S. 123, 2 S. Ct. 277, 27 L. Ed. 437. What a statute allows to be done in a particular mode conclusively negatives any other mode. Raleigh & Gaston R. R. Co. v. Reid, 13 Wall. 269, note, 20 L. Ed. 570. Where the Legislature grants authority to do a thing in a certain way, by necessary implication it prohibits the doing of it in any other way. Stephans v. Smith, 10 Wall. 321, 19 L. Ed. 933.

From this section it will be seen that the framers of the Constitution were dealing with the elective branch of the national government; the one branch of the goverment that was given to the people themselves in elections to be held for that purpose.

It was never contemplated that either the judicial or executive departments should have any control over the election of the people's representatives, the only direct

touch and control that the people have over their government. The framers of this government were careful to divide it into three departments, and to have these departments separate and distinct; and, not being content to leave the matter entirely in the states' discretion, fo.· fear the states might fail to act in electing their representatives, it was considered power to vest some control in the national authorities. It was also considered proper to vest this control in the national Legislature, and, having named the party who would correct the act of the state when it needed correction, the control cannot be delegated to any other agency. It is true every state constitutional provision is subject to the restraint of the Federal Constitution when it clashes with the Federal Constitution. Construction of the state Constitution by a state court is, of course, a different thing from the construction of the Federal Constitution by a state court. It would be permissible for the legislative power to lay restraints upon themselves, or the people could do so in Constitutional Convention assembled. This was held in the case of Ohio v. Hildebrant, 241 U. S. 565, 36 S. Ct. 708, 60 L. Ed. 1172, in which the Ohio court held that the referendum provisions of the state Constitution were a part of the legislative power, and that elections in pursuance thereof were valid so far as that power of the Supreme Court of the United States was concerned. To the same effect is the case of Mountain Timber Co. v. State of Washington, 243 U. S. 219, 37 S. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642.

The power to control the states being vested in Congress by express language in regard to the time and manner of holding elections for congressmen makes it a legislative or political power which is separate from, and independent of, the other departments of government. The determination of that question is exclusively for Congress, and state enactments are valid until Congress has acted; and so far as they do not conflict with the enactments of the United States Congress. In other

words, if Congress has acted, and the state has acted, both enactments stand if not in conflict, and if they do conflict, the state being subject to limitations, the Congress is supreme. Re Siebold, 100 U. S. 371, 25 L. Ed. 717; Re Yarbrough, 110 U. S. 651, 4 S. Ct. 152, 28 L. Ed. 274; Re Coy, 127 U. S. 731, 8 S. Ct. 1263, 32 L. Ed. 274; United States v. Mosley, 238 U. S. 383, 35 S. Ct. 904, 59 L. Ed. 1355.

The power conferred on Congress by the Constitution cannot be conferred upon another department. Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377; Re Garland, 4 Wall. (71 U. S.) 333, 18 L. Ed. 366.

Under the provisions of the Federal Constitution by which the United States guarantees to every state a republican form of government, the courts, have no power to determine whether a particular government is republican in form or not; that question being entirely for the political department of government. Luther v. Borden, 7 How. 1, 12 L. Ed. 581; Pacific States Telephone Co. v. Oregon, 223 U. S. 118, 32 S. Ct. 224, 56 L. Ed. 377; Georgia v. Stanton, 6 Wall. 49, 18 L. Ed. 723-725, where it is said: "This distinction results from the organization of the government into the three great departments, executive, legislative, and judicial—and from the assignment and limitation of the powers of each by the Constitution. The judicial power is vested in one Supreme Court, and in such inferior courts as Congress may ordain and establish; the political power of the government in the other two departments. The distinction between judicial and political power is so generally acknowledged in the jurisprudence both of England and of this country, that we need do no more than refer to some of the authorities on the subject. They are all in one direction. New York v. Conn., 4 Dall. 4 [1 L. Ed. 717]; Nabob of Carnatico v. E. I. Co., 1 Ves. Jr. 375; [S. C.] 2 Ves. Jr. 56; Penn v. Lord Baltimore, 1 Ves. Sr. 446, 447; Cherokee Nation v. Georgia, 5 Pet. 1 [8 L. Ed. 25.] . . . The remaining question on this branch

of our inquiry is, whether, in view of the principles above stated, and which we have endeavored to explain, a case is made out in the bill of which this court can take judicial cognizance. In looking into it, it will be seen that we are called upon to restrain the defendants, who represent the executive authority of the government, from carrying into execution certain acts of Congress, inasmuch as such execution would annul and totally abolish the existing state government of Georgia, and establish another and different one in its place; in other words, would overthrow and destroy the corporate existence of the state by depriving it of the means and instrumentalities whereby its existence might, and otherwise would, be maintained. This is the substance of the complaint, and of the relief prayed for. The bill, it is true, sets out in detail the different and substant al changes in the structure and organization of the existing government, as contemplated in these acts of Congress; which, it is charged, if carried into effect by the defendants, will work this destruction. But, they are grievances, because they necessarily and inevitably tend to the overthrow of the state as an organized political body. They are stated, in detail, as laying a foundation for the interposition of the court to prevent the specific execution of them; and the resulting threatened mischief. So in respect to the prayers of the bill. The first is that the defendants may be enjoined against doing or permitting any act or thing, within or concerning the state, which is or may be directed, or required of them, by or under the two acts of Congress complained of; and the remaining four prayers are of the same character, except more specific as to the particular acts threatened to be committed. That these matters, both as stated in the body of the bill, and in the prayers for relief, call for the judgment of the court upon political questions, and upon rights, not of persons or property, but of a political character, will hardly be denied. For the rights, for the protection of which our authority is

invoked, are the rights of sovereignty, of poltical juris-
diction, of government, of corporate existence as a state,
with all its constitutional powers and privileges. No
case of private rights or private property infringed, or in
danger of actual or threatened infringement, is presented
by the bill, in a judicial form, for the judgment of the
court. It is true, the bill, in setting forth the political
rights of the state, and of its people to be protected,
among other matters, avers that Georgia owns certain
real estate and buildings therein, state capitol, and ex-
ecutive mansion, and other real and personal property;
and that putting the acts of Congress into execution, and
destroying the state, would deprive it of the possession
and enjoyment of its property. But it is apparent that
this reference to property and statement concerning it,
are only by way of showing one of the grievances result-
ing from the threatened destruction of the state, and in
aggravation of it, not as a specific ground of relief. This
matter of property is neither stated as an independent
ground, nor is it noticed at all in the prayers for relief.
Indeed, the case, as made in the bill, would have stopped
far short of the relief sought by the state, and its main
purpose and design given up, by restraining its remedial
effect, simply to the protection of the title and possession
of its property. Such relief would have called for a very
different bill from the one before us."

See, also, Mississippi v. Johnson, 4 Wall. 475, 18 L.
Ed. 441, 500, where the court said: "The Congress is
the legislative department of the government; the pres-
ident is the executive department. Neither can be re-
strained in its action by the judicial department; though
the acts of both, when performed, are, in proper cases,
subject to its cognizance. The improperiety of such in-
terference will be clearly seen upon consideration of its
possible consequences. Suppose the bill filed and the
injunction prayed for allowed. If the president refuse
obedience, it is needless to observe that the court is with-

out power to enforce its process. If, on the other hand, the president complies with the order of the court and refuses to execute the acts of Congress, is it not clear that a collision may occur between the executive and legislative departments of the government? May not the House of Representatives impeach the president for such refusal? And in that case could this court interfere, in behalf of the president, thus endangered by compliance with its mandate, and restrain by injunction the Senate of the United States from sitting as a court of impeachment? Would the strange spectacle be offered to the public world of an attempt by this court to arrest proceedings in that court? These questions answer themselves. It is true that a state may file an original bill in this court. And it may be true, in some cases, that such a bill may be filed against the United States. But we are fully satisfied that this court has no jurisdiction of a bill to enjoin the president in the performance of his official duties; and that no such bill ought to be received by us.''

It seems to me that no more important right can be conferred than the one in this case. It gives the people of the state a representative form of government, provided Congress enforces the regulations; but even should the state, or some one in its name who has seized the political power and usurped all the powers of the state, enact a measure not in conflict with the enactments of Congress, then the courts would be powerless to intervene.

Again, the Federal Constitution provides that a person who has committed a crime in one state, and is found in another state, on demand of the executive of the state where the crime was committed, may be arrested by the executive of that other state, and delivered to the state where the crime was committed. Under this section of the Constitution, the courts cannot compel compliance. Kentucky v. Dennison, 24 How. 66, 16 L. Ed. 717; Taylor v. Taintor, 16 Wall. 366, 21 L. Ed. 287.

Questions of a political nature are exclusively for the determination of Congress.

It belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and intentions expressed. United States v. The Three Friends, 166 U. S. 1, 17 S. Ct. 495, 41 L. Ed. 897.

The Federal Supreme Court has no supervising power or control over the political branch of the government in its action within the limits of the Constitution. Wilson v. Shaw, 204 U. S. 24, 27 S. Ct. 233, 51 L. Ed. 351.

For the reasons named, I am of opinion that it was error to have granted the writ of mandamus, and that the judgment should be reversed, and the petition dismissed.

**Anderson, J.,** delivered a specially concurring opinion.

I agree fully with what Judge ETHRIDGE has said in his concurring opinion, and I do not think I can make our position any clearer than he has, and still I feel that I would like to state, in a very short and concise manner, my position as to whether we have here a judicial or legislative question.

The first clause of paragraph 1, section 4, of article 1 of the Constitution, delegates the power to map the states into congressional districts to their Legislatures. The second clause provides, however, that Congress shall have the power to make or alter such regulations of the states. In pursuance of that clause, the Act of Congress of August 8, 1911, was passed.

It is claimed that our redistricting act violates the Act of Congress. Concede that it does. Is the remedy with the courts or with Congress; is it a judicial or a political question? It is manifest to me that the constitutional provision itself answers that question in unmistakable terms. It provides the remedy when the states abuse their power. ''Congress may *at any time* by law make

or alter such state regulations.'' (Italics mine.) Where is the field for the courts to operate? The Constitution says to the states, the power is given you, but if you abuse it the Congress shall either alter your action or take the power away from you entirely. The remedy furnished by the Constitution is complete and effective, and there is no domain within which the courts can operate.

The Congress is now in session. Suppose this court should hold the act of the Legislature remapping the state into congressional districts void, and Congress should immediately pass an act redistricting the state, adopting the identical districts mapped out in the state act, which would control, the act of Congress or the judgment of this court? Certainly the Act of Congress, because under the Constitution Congress is made supreme in the field. Then we would have a most novel condition of affairs. We would have a judgment of the highest court of the state holding the state act violative of the Constitution of the United States, and at the same time an Act of Congress validating the same act. In other words, we would have an act of Congress setting aside the judgment of the Supreme Court of this state. If this is a judicial question, of course, no act of Congress could bring about any such result. If this be true, to my mind it demonstrates that we have here purely a political, and not a judicial, question.

Smiley v. Holm, 284 U. S. 616, 52 S. Ct. 266, 76 L. Ed. —; Koenig v. Flynn, 52 S. Ct. 403, 76 L. Ed. —; and Carroll v. Becker, 52 S. Ct. 402, 76 L. Ed. —, are not authority for the proposition that the Supreme Court has treated this question as a judicial and not a political one. The question in those cases was not whether the legislatures of Minnesota, New York, and Missouri had violated the Federal statute in remapping the congressional districts of those states, in pursuance of the Act of Congress, *but whether they had taken any action at all on the subject.* The Act of Congress required *legislation* on the subject. The Supreme Court held that what the legislatures of those states had done was not legislation;

that their action amounted to no action at all. The question whether the Federal statute had been violated was not involved. Instead, the question alone was whether or not any action had been taken under the Federal statute. If those states had taken action, remapping their congressional districts, and the question had been whether or not, in so doing, the Federal statute had been violated in respect to equality of population in their districts, that would have been the same question as is here involved; and would have been a political, and not a judicial, question.

The Supreme Court of the United States has decided time and again (the cases are cited by Judge ETHRIDGE in his concurring opinion) that the question whether the guaranty of the Constitution that the states shall establish and maintain a republican form of government is a political and not a judicial question. However, it seems clear that it would be a judicial and not a political question whether a state had any government at all, or which of two contending sets of state officers represented the real government.

Why should the question whether a state has a republican form of government be a political question; and at the same time the question whether a state has violated the Constitution in remapping its congressional districts be a judicial question? What good reason can be given why the same principles should not apply? It seems that there is a stronger reason for holding the question here involved to be a political one, than whether a state has a republican form of government; because, as attempted to be shown above, the Constitution itself furnishes a complete and adequate remedy for any abuse of power by the states in remapping their congressional districts.

Cook, J., delivered a dissenting opinion.

I concur in the views of the court that a court of equity, in this state, is without jurisdiction to enjoin any

steps leading to the holding of a primary or general election, or receiving and certifying the results thereof, and that as a consequence the decree of the chancellor in the case of Charles E. Brumfield et al. v. D. T. Brock et al., 142 So. 745, should be reversed, and the bill dismissed. I am unable to concur in the reversal of the case of Walker Wood, Secretary of State, v. State ex rel. Hugh Gillespie, District Attorney, wherein mandamus was ordered directing the secretary of state to receive the names of legally qualified candidates for Congress who offered themselves as candidates from the state at large, and to otherwise perform all the duties imposed upon him by law incident to the election of candidates for the House of Representatives of the Congress of the United States from the state at large; and enjoining him from receiving any returns of district primary elections for members of Congress, or including on the official ballot for the regular November election the names of any persons nominated, or otherwise attempting to qualify as candidates for Congress from any subdivision of the state or alleged congressional district, or from receiving the returns from any election showing the election of any person to the House of Representatives of the Congress of the United States from any alleged congressional district, or from certifying to the governor of the election of any such person from any pretended congressional district within the state.

The purpose of the petition for mandamus is to have annulled the act of the 1932 Legislature redistricting the state for the election of members of Congress, which is House Bill No. 197, and the petition sets forth all the allegations of law and fact touching the alleged invalidity of such act.

The asserted invalidity of this act is based upon the alleged failure of the Legislature to divide the state into congressional districts ''containing as nearly as practicable an equal number of inhabitants,'' and the petition alleges that, unless the writ is issued, the secretary of

state will do and perform all the duties required of him by law in holding, in the districts prescribed by the act, congressional elections, and in receiving the returns thereof, and. certifying the election of congressmen by districts, and will pay the expense of such elections out of the state treasury. In support of the charge that the said redistricting .act is in contravention of the act of Congress imposing limitations upon the right of the Legislature to redistrict the state, it was shown that under the provisions of this act the First district contains two hundred forty-one thousand six hundred five inhabitants; the Second, two hundred nineteen thousand six hundred sixty-one; the Third, four hundred two thousand nine hundred sixty-nine; the Fourth, one hundred eighty-four thousand two hundred sixty-six; the Fifth, two hundred forty-four thousand five hundred sixty-two; the Sixth, two hundred eighty-four thousand four hundred fifty-seven; and the Seventh, four hundred fourteen thousand three hundred one.

It was further charged that, in so defining the boundaries of the districts in said act, the Legislature wholly disregarded the act of Congress prescribing limitations upon the power of the Legislature to redistrict the state, and arbitrarily failed and neglected to redistrict the state as a whole, but, on the contrary, simply combined the Seventh and Eighth congressional districts as they had previously existed, leaving the other six districts practically as they were prior to the census of 1920, and that in so doing there was created a glaring, unfair, and unjust inequality in population as between the districts.

It was further charged that duly qualified electors of the state will, within the time required by law, offer themselves as candidates from the state at large at the general election to be held on the first Tuesday after the first Monday in November, 1932, for members of the House of Representatives of the Congress of the United States; that this is the only legal method under the now existing law by which members of the Congress of the

United States can be elected from this state; and that the secretary of state will fail and refuse to prepare a sample ballot containing the names of such persons, and will fail, neglect, and refuse to transmit a sample ballot containing the names of such persons as candidates for the House of Representatives of the Congress of the United States to the proper election commissions of the various counties, as required by law, unless he is required so to do by the court. These allegations of the petition, as well as others, which will be hereinafter referred to, were admitted by the demurrer interposed thereto.

In recognition of the well-established doctrine that mandamus is a discretionary writ, and that in the exercise of a sound judicial discretion the writ may be, and should be, denied where the circumstances make it unwise and inexpedient to allow it, or where the detriment to the public interest resulting from its allowance out weighs any supposed benefit flowing therefrom, I deem it proper and necessary to consider the merits of the issues in controversy in order that the public interest affected by the denial of the writ may be made more ap parent.

By paragraph 1 of section 4 of article 1 of the Constitution of the United States, it is provided that: ''The times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the Legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing senators.'' This provision grants to the Legislatures of the several states an absolute right to prescribe the times, places, and manner of holding elections for senators and representatives in the absence of legislation by Congress on these subjects, but expressly grants to the Congress the right to regulate these matters, and, when Congress enters that field of legislation, its acts become supreme. Prior to 1842, Congress merely fixed the number of representa-

tives and apportioned them among the states. In 1842 (5 Stat. 491) for the first time, Congress exercised its right under section 4 of article 1 to regulate the manner of holding elections for representatives by providing that they should be elected by districts composed of contiguous territory. The apportionment act of 1872 (17 Stat. 28) not only required that the members of the House of Representatives of the Congress should be elected by districts composed of contiguous and compact territory, but it contained the further provision that such districts should contain as nearly as practicable an equal number of inhabitants, and these provisions have been included in each apportionment act from 1872 up to and including the act of 1911. Following the census of 1910, in the exercise of its right to regulate the holding of election for members of the House of Representatives, the Congress enacted a statute effective August 8, 1911, sections 3 and 4 (2 U. S. C. A., secs. 3, 4) of which read as follows:

"Section 3. Election by districts. In each state entitled under this apportionment to more than one representative, the representatives to Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. The said districts shall be equal to the number of representatives to which such state may be entitled in Congress, no district electing more than one representatives. (Aug. 8, 1911, chap. 5, sec. 3, 37 Stat. 14.)

"Section 4. Additional representatives at large. In case of an increase in the number of representatives in any state under this apportionment such additional representative or representatives shall be elected by the state at large and the other representatives by the districts prescribed by law on August 8, 1911, until such state shall be redistricted in the manner provided by the laws thereof and in accordance with the rules enumerated in section 3; and if there be no change in the

number of Representatives from a state, the representatives thereof shall be elected from the districts prescribed by law on August 8, 1911, until such state shall be redistricted as herein prescribed. (Aug. 8, 1911, chap. 5, sec. 4, 37 Stat. 14.)''

Under the apportionment act of 1911, this state was entitled to eight representatives in Congress. Following the census of 1920, no act was passed reapportioning the number of representatives, and no further legislation was enacted on the subject until 1929, when Congress passed an act (2 U. S. C. A., sec. 2a) which apparently was designed to prevent future omissions to reapportion after each decennial census. Under this act, it was provided that within one week after the convening of the second regular session of the Seventy-First Congress and of each fifth Congress thereafter, the president shall transmit to the Congress a statement showing the whole number of inhabitants of each state, excluding Indians not taxed, as ascertained by the next preceding census, and the number of representatives to which each state would be entitled under an apportionment of the then existing number of representatives, as computed by methods therein prescribed. It was further provided that if, after the submission of this statement by the president, Congress shall fail to enact a law apportioning representatives among the several states, then each state shall elect the number of representatives to which it would be entitled according to a computation based on the method used in the last preceding census.

Upon consideration of this act, there at once arises the question of whether or not it repealed the act of 1911 prescribing limitations upon the power of the Legislatures of the several states to form congressional districts. We understand counsel for the appellant to concede that the act of 1929 does not repeal sections 3 and 4 of the Act of 1911, but I have made an independent examination of the provisions of the Act of 1929, and I find nothing therein which repeals any of the provi-

sions of the Act of 1911 in reference to the formation of congressional districts. In support of this view, I refer to the case of Moran v. Bowley, 347 Ill. 148, 179 N. E. 526, 530, wherein the Supreme Court of that state, after a full and exhaustive discussion of the purpose and effect of the two acts, said: "Congress with conscientious zeal guarded the importance and necessity of regular decennial apportionments by making each act apply not only to the next decennial census but to all subsequent decennial censuses. The conclusion seems irresistible that Congress wanted to make decennial apportionments a certainty and did not intend to release its control over the manner of electing representatives. We cannot bring ourselves to the belief that Congress intended to forsake the field of legislation which it had completely occupied for more than half a century. . . . We have no hesitancy in saying that the Act of 1911 is in full force and effect so far as it relates to the formation of congressional districts."

The question then recurs as to whether or not the redistricting act of 1932, House Bill No. 197, is a legal and valid exercise of the power granted to the Legislature by the paramount constitutional provision and congressional act. In the exercise of the power granted to it by section 4 of article 1 of the Constitution, the Congress has by section 3 of the Act of 1911 placed limitations upon the right of the Legislature in the formation of congressional districts by providing, among other things, that such districts shall contain "as nearly as practicable an equal number of inhabitants;" and since Congress has entered this field of legislation granted to it by the Constitution, and has placed this regulation and limitation on the power of the Legislature to form congressional districts, this section is as binding upon the Legislature in that regard as would be a similar provision of a state constitution regulating or limiting the power of the Legislature in the formation of districts for the election of members of the state Senate or House of

Representatives. And the significance of this statement will be more apparent when I come to consider the question of whether or not the issues involved are political, of which the court will not take cognizance.

Upon a consideration of House Bill No. 197, purporting to redistricting the state, it appears perfectly manifest to me that the Legislature has not made any conscientious effort to observe the provisions of the act of Congress regulating the exercise of its power to redistrict, but, on the contrary, has wholly disregarded that act and treated it as having no binding force whatever. This state is largely an agricultural one; its land being level or slightly rolling. Every part of the state is easily accessible to the other by railroads and by motor vehicles traveling over highways constructed and maintained by state and federal aid, and there is nothing in its topography which presents any sort of barrier or obstacle to redistricting the state in accordance with the paramount law on the subject. The voters of this state are found among a homogenous people, largely engaged in or dependent on agriculture, having similar interests and characteristics; the only exceptions being the particular interest of the people living in the Mississippi Delta in levee improvement, and, to a more limited extend, the interest of the residents of the Mississippi coast in harbors. But neither of the last-named special interests presents any obstacle whatever to an equitable and fair redistricting of the state so as to give to all the people approximately equal representation in Congress. This being true, let us consider the results that have been accomplished by the enactment of House Bill No. 197.

Under the reapportionment following the decennial census of 1930, this state lost one representative in Congress, and it became necessary to reduce the number of districts from eight to seven. With a population of one million nine hundred ninety-one thousand eight hundred twenty-three, entitled to seven congressmen, the

basis of exact equality in representation is two hundred eighty-four thousand five hundred forty-seven; and this basis the Legislature was mandatorily required to observe with a reasonable degree of approximation. As the districts were formed, the Sixth, with two hundred eighty-four thousand four hundred fifty-seven inhabitants, has approximately the required ratio of population. The First district has forty-two thousand nine hundred forty-two; the Second, sixty-four thousand eight hundred eighty-six; the Fourth, one hundred thousand three hundred eighty-one; and the Fifth, thirty-nine thousand nine hundred eighty-five less inhabitants than the ratio or basis required for equality; while the Third district has one hundred eighteen thousand four hundred twenty-two, and the Seventh one hundred twenty-nine thousand seven hundred fifty-four more than the fixed basis. The Third and Seventh districts have a combined population of eight hundred seventeen thousand two hundred seventy, or more than forty-one per cent of the entire population of the state. The Seventh district has two hundred thirty thousand ninety-five more inhabitants than the Fourth district, or two and one-quarter times as many inhabitants. Such a redistricting gives a voter in the Fourth district two and one-quarter times as much weight in electing a congressman as a voter has in the Seventh district; or, in other words, in electing congressmen, the power of four voters in the Fourth district is equal to that of nine in the Seventh district. The inequality in the remaining districts is almost as glaring, and a mere reading of these figures makes it clear that there was no substantial compliance with the act of Congress and no approximation towards equality in representation. In fact, it is apparent that there was no real attempt on the part of the Legislature to redistrict the entire state, but rather it merely combined two of the then existing districts lying in the south central and southwestern part of the state into one, leaving the remaining districts practically as they were from 1912 to 1932.

In view of the fact that there were no substantial obstacles to prevent the creation of districts having approximately the same number of inhabitants, I do not think any reasonable mind can conclude that, in the creation of the districts with the glaring inequalities mentioned above, the Legislature has in any manner observed or attempted to comply with the mandatory requirements that the districts shall contain as nearly as practicable an equal number of inhabitants. But it is said by way of argument, that, in requiring that the district shall contain as nearly as practicable the same number of inhabitants, Congress has fixed no definite standard of equality that the courts can determine or enforce, and that consequently the Legislature is the sole judge of what constitutes approximation of the required basis or standard, or practical equality in population. This would be true so long as variation of population between the districts was limited to reasonable bounds, but it is to my mind inconceivable that any one could reasonably contend that variations or inequalities so glaring, unfair, and unjust could result from a conscientious exercise of legislative discretion.

While section 3 of the Act of Congress of 1911 requires the exercise on the part of the Legislature of an honest and fair discretion in redistricting the state, so as to preserve as nearly as may be equality of representation, perfect exactness in redistricting according to the number of inhabitants is neither required nor possible, but there should be as close approximation to exactness as possible, and this is the limit of the exercise of legislative discretion. If, as in this case, there is such a wide and bold departure from the rule prescribed by Congress that it cannot be justified by the exercise of judgment or discretion, and that evinces an intention on the part of the Legislature to utterly ignore and disregard the mandatory requirement of the congressional act, then the conclusion is inevitable that the Legislature has not exercised proper judgment and discretion.

The disparity in the number of inhabitants in the several districts is too great and glaring, and deprives too many people of the state of their proper representation in Congress, to be allowed to pass as mere mistakes in calculation or errors of judgment, or as an honest and fair attempt to properly exercise judgment and discretion.

That the Legislature was fully advised that the act so proposed to be adopted was not a substantial compliance with the paramount law of the land cannot be doubted. It is a matter of common knowledge in this state that the act was under consideration by the Legislature for a long period of time; and it may be assumed that, in the acrimonious debates incident to its passage, it was fully advised as to the facts, the controlling law, and the consequences of a total disregard of this fundamental law. But from the record in this case itself, we are not left in doubt on that question. On May 16, 1932, before the act was finally enacted, the governor addressed to the Legislature a message on the proposed House Bill No. 197, which message is made an exhibit to the petition filed in this cause. In that message the governor called the attention of the Legislature to the legal questions involved, the glaring inequality of population in the proposed districts, the injustices which would result therefrom, the absence of obstacles to a fair and equitable redistricting, and, in forceful language, sought to impress upon it that the passage of the act in the form proposed would violate the fundamental principle of representative government. He therein also informed the Legislature that the attorney-general of the state had advised that there was serious doubt of the legality of the proposed redistricting act, and closed with a warning and suggestion in the following language: "I am constrained by my sense of duty to warn you of this danger, and to urge you to make further effort for redistricting the state in accordance with the provisions of the Act of Congress and the Constitution of the United States. I suggest that a concurrent resolution be adopt-

ed immediately providing for a joint committee to prepare and present to you without delay a bill that will, regardless of all other considerations, provide for a division of the state into seven compact and contiguous congressional districts, containing as nearly as practicable an equal number of inhabitants, and, if you are unable to solve this problem before the hour you have set for final adjournment, that you extend your session until such time as may be reasonably necessary to perform this very important duty, which should not require so much delay since you have had this matter under consideration for nearly four months. I presume to warn you that unless you take this course serious complications and much inconvenience and confusion may arise in the selection of our representatives in Congress.''

The Legislature did not, however, regard the warning and suggestion of the governor by taking further action. The act was permitted to go into effect without the signature of the governor, and, to my mind, it appears manifest that it is in contravention of the paramount law of Congress, and therefore invalid.

It is strenuously argued that the formation of congressional districts is so exclusively within the political power of the Legislature that the court is precluded from inquiring into their validity or determining whether or not an act creating such districts is within the legislative discretion as limited and defined by the act of Congress. In order to justify my conclusion that the writ should issue, it will be necessary for me to respond to this contention, which is, in my judgment, contrary to the great weight of authority. In considering this question, I again call attention to the fact that section 3 of the Act of Congress of 1911, regulating and placing limitations on the discretionary power of the Legislature to define and create congressional districts, is as binding upon the Legislatures in that field of legislation as are similar state constitutional provisions regulating or limiting the power of the Legislature in the formation

of districts for the election of members of the state Senate or House of Representatives. This being true, the numerous decisions of the courts of other states, passing upon the question of whether or not such districting acts are violative of similar state constitutional provisions requiring, in substance and effect, that such districts shall contain as nearly as practicable an equal number of inhabitants, are directly in point. And since there seems to be practically no dissent from the view that the validity vel non of apportionment acts passed in the exercise of the legislative discretion conferred by such constitutional provisions is not such a political question as will preclude the courts from passing upon their validity and determining whether or not such acts are within the bounds of the discretion committed to the Legislature, it would seem that these decisions should be conclusive upon the point.

In support of this view, there are decisions from the Supreme Courts of the states of Illinois, Indiana, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New York, Nevada, New Jersey, Pennsylvania, Ohio, West Virginia, Wisconsin, and Washington. These cases may be found collated in the case note or annotation following the case of Donovan v. Suffolk County Apportionment Commissioners, from the Supreme Court of Massachusetts, 225 Mass. 55, 113 N. E. 740, as the same is reported in 2 A. L. R. 1334. The principle involved in these cases is identical with that involved in the case at bar, and, with the substitution of the words "act of congress" for "constitution" in the language of these decisions, they are applicable here.

As illustrative of the doctrine announced by these decisions, I refer to the case of Parker v. State, 133 Ind. 178, 32 N. E. 836, 33 N. E. 119, 18 L. R. A. 567, wherein the court held that "The constitutionality of a legislative Apportionment Act is a judicial question and not one which the court cannot consider on the ground that it is a political question;" and the case of Brooks v.

State, 162 Ind. 568, 70 N. E. 980, in which it was held that the courts have a right to determine whether the discretion vested by the Constitution in the Legislature in the creation of representative districts has been abused; and the case of Attorney-General v. Suffolk County Apportionment Commissioners, 224 Mass. 598, 113 N. E. 581, wherein, in an action challenging the validity of an apportionment act, it was held that the court has jurisdiction to determine whether the constitutional requirements have been violated; and the case of Sherrill v. O'Brien, 188 N. Y. 185, 81 N. E. 124, 128, 117 Am. St. Rep. 841, in which the court used the following language: "If the Legislature under the assumption of an exercise of discretion does a thing which is a mere assumption of arbitrary power, and which, in view of the provisions of the Constitution, is beyond all reasonable controversy, a gross and deliberate violation of the plain intent of the Constitution, and a disregard of its spirit and the purpose for which express limitations are included therein, such act is not the exercise of discretion, but a reckless disregard of that discretion which is intended by the Constitution. . . . A legislative apportionment act cannot stand as a valid exercise of discretionary power by the Legislature when it is manifest that the constitutional provisions have been disregarded."

In further support of this view, I refer to the case of State of Wisconsin ex rel. Adams County v. Cunningham, 81 Wis. 440, 51 N. W. 724, 15 L. R. A. 561; also 18 R. C. L. 272, and 12 C. J. 881, and authorities cited in support of these texts.

From the very recent case of Moran v. Bowley, 347 Ill. 148, 179 N. E. 526, the Supreme Court of Illinois assumed jurisdiction of a cause challenging the validity of a congressional redistricting act of that state, and held that on account of the glaring inequalities of population from the several districts, as constituted under this act, it was void as being in contravention of section 3 of the Act of Congress of 1911.

In the case of McPherson v. Blacker, Secretary of State, 146 U. S. 3, 13 S. Ct. 3, 6, 36 L. Ed. 869, the Supreme Court of the United States held that the question of the validity of a Michigan act providing for the election of presidential electors was a judicial question, and that it could not decline to exercise its jurisdiction "upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of the highest tribunal of the state, as revised by our own;" and, in so doing, it effectively answered any suggestion that the courts should refuse to declare congressional redistricting acts void as being in contravention of the Act of Congress, for the reason that, in the final analysis, the Congress is the judge of the qualification of its own members, and in the exercise of that judgment it might disregard the judgment of the court.

If, however, there could have been any previous doubt as to whether or not the question of the validity of congressional redistricting acts was judicial rather than political, it appears to me that such doubt was necessarily removed by the Supreme Court of the United States in the cases of Smiley v. Holm, 284 U. S. 616, 52 S. Ct. 266, 76 L. Ed. —; Carroll v. Becker, Secretary of State, 52 S. Ct. 402, 76 L. Ed. —; and Koenig v. Flynn, Secretary of State, 52 S. Ct. 403, 76 L. Ed. —, all decided April 11, 1932, wherein the court assumed jurisdiction of mandamus proceedings to declare void attempts at congressional redistricting by the states of Minnesota, Missouri, and New York, respectively. But it is said that these cases are neither controlling nor persuasive on the question of whether the validity vel non of redistricting acts is so exclusively political in its nature as to preclude the court from exercising jurisdiction to inquire into it, for the reason that in these cases the court assumed jurisdiction and sustained the right to mandamus solely upon the ground that the several redistricting acts involved were not passed in the manner required by the Constitutions of those states;

in other words, it only held that the legislatures of those states could not effectively redistrict for congressional representatives by a concurrent resolution or enactment not approved by the governor, but could only do so by legislative enactment approved by the governor.

It is true that there was involved in these cases no question of the invalidity of congressional redistricting on account of any inequality in the population of the districts attempted to be created, but there was involved the question of whether or not the Legislature had validly exercised its power to redistrict. If the latter question is judicial, why is not the former likewise judicial? I am unable to make the distinction. It has been frequently said that a statute which is void because it violates some controlling constitutional or statutory provision is mere "waste paper," and I cannot see that the power and duty of the court to pass upon the validity of an enactment of the Legislature that was not approved by the governor, as required by the Constitution, can be any broader or more extensive than the power and duty to pass upon the validity of an act passed in direct violation and utter disregard of constitutional provisions, or paramount and controlling congressional acts. Certainly, it must be true that if the manner in which the legislatures may redistrict their states for the election of congressmen is purely a political question beyond the power of the courts to inquire into it, the Supreme Court of the United States would not have concerned itself with the question of whether or not the Legislature had redistricted its state by concurrent resolution or by law enacted in the manner prescribed by the Constitution of these states.

Passing now to the consideration of whether or not the mandamus should be denied, although the legal right of petitioner is clear, I shall discuss the grounds assigned by the majority of the court for the dismissal of the petition in the order followed by the majority opinion.

In considering each of the grounds upon which the

refusal of the writ is based, it should, however, be borne in mind that, if this writ is denied, the people in the affected districts, who are represented by the relator, and who will suffer from the unfair discrimination created by the act in question, have no other available remedy, and must continue to suffer the injustice, the loss of voting power, and the fundamental right of equal representation, for at least ten years, unless an intervening Legislature can and will grant relief by way of amendment of the redistricting act; and, under the circumstances which forced this inequitable and void law upon a minority of the people of the state having a minority representation in the state Legislature, there is no reasonable probability of relief in that way. On the other hand, if the court should hold that the act in question is void, and order the issuance of the writ, thereby serving effective notice upon the Legislature that the paramount law of the land must be observed in districting the state, there can scarcely be any doubt that a fair and equitable act will be passed at the next biennial session of the Legislature, or sooner, if it should be called into extraordinary session.

The first ground assigned for denial of the writ is that it will not issue unless and until there has been actual default in the performance of some duty required of the defendant. If this rule of law is applicable to the facts involved in the case at bar, it means there can never be any relief through the courts from any sort of void enactment of the Legislature providing for the election of congressmen. As pointed out by the majority, the secretary of state has no duty to perform with reference to the general election in November until within fifteen days of the date of the election, and, if the aggrieved citizens of the state must wait until that late date to attack the validity of an act under which the secretary of state may be presumed to act, it necessarily means that the election would be over long before effective relief could be granted by the court. The same condition would

exist at each recurring election of congressmen, resulting each time in denial of relief.

I have no fault to find with the statement of the majority of the court that mandamus will not issue to the governor in any case, or with the many authorities cited in support of this well-established proposition. The writ prayed for, and ordered by the court below, is not directed to the governor, and does not seek to control his acts in any respects. It regulates the preparation of sample ballots by the secretary of state, and, while the governor is required by section 6234, Code 1930, to approve the sample ballot before it is furnished to the ticket commissioners of the counties, the preparation and distribution of this sample ballot is in no proper sense the joint act of the governor and the secretary of state. In the preparation and distribution of this ballot the governor has no part other than to approve or disapprove it when presented to him, and I have no fear of the governor's refusing to co-operate with the secretary of state by approving any sample ballot that has been prepared in strict compliance with any existing statute for the holding of an election, which has been declared by this court to be valid and applicable. The writ of mandamus, as ordered by the court below, would be effective to prevent any action or steps leading to the holding of an election under House Bill No. 197, if this court should declare that act void and sustain the issuance of the writ.

In the case of State v. Coahoma County, 64 Miss. 358, 1 So. 501, 505, the court said: "It is not to be assumed, and on that assumption to base a judicial proceeding, that the body charged with a duty under this act will not perform it at the proper time. A presumption must be indulged that duty will be performed." This announcement of the court presupposes a valid law and judicial action to require the performance of legal duties thereunder; and I do not think it can properly be said to be authority for a denial of a writ to prevent the perform-

ance of acts which, if performed, would result in the full, complete, and effective operation of a void law. I readily agree that the presumption must be indulged that a public officer will perform his public or official duties, and I think the presumption must be indulged that the present secretary of state will perform such duties as are required of him by law to render effective and fully operative the act of the Legislature in redistricting the state for the election of congressmen. Whatever may be said of the ability of the secretary of state to pass upon the validity of this act, he has no power to determine that question, or declare the act void; and so long as it remains unchallenged in the courts, and unchallengeable according to the views of the majority of this court, the presumption should be indulged that he will perform all the official duties required of him to render it fully operative. This being true, the laws of the state fixing the duties of the secretary of state, and the presumption of performance required by and incident to the enforcement of the act of Legislature, stand in lieu of a demand. There is no refusal to act to be corrected in this proceeding; but, on the contrary, the purpose sought to be accomplished is the prevention of action which would result in the enforcement and operation of a void legislative enactment. If the application for mandamus cannot be made until there is a refusal to act, under the circumstances of this case there can never be a remedy.

In the case of State ex rel. Morris v. Wrightson, 56 N. J. Law, 126, 28 Atl. 56, 22 L. R. A. 548, the Supreme Court of New Jersey held that: "Mandamus to compel officers to proceed under prior laws in respect to elections instead of following an unconstitutional statute is not premature because no demand and refusal has been made or the time arrived when it is the duty of the officers to act;" and, in discussing the contention that demand and refusal is an essential prerequisite to an application for mandamus in any case and under all circumstances, said:

"There is a distinction between duties of a public nature and duties of a private nature affecting only the rights of individuals. In the latter class of cases, demand and refusal are held to be necessary as a condition precedent to relief by mandamus; in the former class, the duty being of a public nature, there is not the same necessity for a literal demand and refusal. In such cases the law itself stands in lieu of a demand, and omission to perform the required duty is equivalent to a refusal. High, Mand., section 13. To postpone the commencement of these proceedings until the time preceding the annual elections, at which the county clerk and the clerks of the cities and townships of the county are required to perform the duties devolved upon them under the election laws, would effectually prevent their institution being ever practically of any avail. The testimony of the county clerk and of other election officers, taken under this rule, makes it apparent that these officials intend to conduct elections in the county under the act of 1891, until otherwise directed, so long as that act is unrepealed. Indeed, the presumption is not to be entertained that these officers would, on constitutional grounds, disregard the act of legislation conforming to precedents of upwards of twenty years' standing, unless the invalidity of the act be first judicially determined."

In addition to the presumption that the secretary of state would perform such duties, the petition charges, and the demurrer admits, that he would perform all the duties required of him to render the challenged act fully operative in the election of congressmen from districts, as therein defined and formed, and this brings the case at bar directly within the holding of the United States Supreme Court in the case of McPherson v. Blacker, 146 U. S. 3, 13 S. Ct. 3, 36 L. Ed. 869, wherein the allowance of a writ of mandamus was sustained on the answer of the secretary of state of Michigan denying that he had refused to give the proper notice of election sought to be required by the petition for the writ, but

expressly averring that he intended to give notices under the law, the constitutionality of which was assailed by the petition. In the case at bar, the admissions by demurrer of the intentions of the secretary of state were substantially the same as the averments as to intention in the answer of the secretary of state in the McPherson v. Blacker Case, supra, and, being upon practically identical facts, this decision of the Supreme Court of the United States should be treated as conclusive and controlling upon the point now under consideration.

The next ground for denial of the writ is that: ''A writ of mandamus will not issue if in ultimate effect it will be nugatory or incomplete, and if its effect in respect to the public will be to introduce serious doubt or confusion or irremediable controversy into those public questions which the writ is invoked to settle.'' In argument in support of this view, it is said that the writ is here sought in order to attempt to control the party primaries of the democratic party in August, 1932, so as to make those primaries state wide and in disregard of congressional districts. A careful consideration of the petition for mandamus, and the order for its issuance, does not disclose to me a purpose to control the democratic primaries, but rather the purpose appears to be to prevent the election of congressmen under a void law, and to require that they should be elected under and in accordance with the existing valid statutes of the state on the subject of the election of congressmen. It is true that the statutes on primary elections contain no provisions for the nomination of candidates for Congress from the state at large, and that they do provide for the nomination of candidates for Congress by districts. However, this provision for the nomination of candidates for Congress by districts necessarily presupposes the existence of validly constituted districts, and it must be considered and construed along with other statutory provisions for the election of con-

gressmen, in the absence of a valid redistricting of the state after a new apportionment.

Section 6277, Code 1930, provides that: "Should an election of representatives in Congress occur after the number of representatives to which the state is entitled shall be changed, in consequence of a new apportionment being made by Congress, and before the districts shall have been changed to conform to the new apportionment, representatives shall be chosen as follows: In case the number of representatives to which the state is entitled be increased, then one member shall be chosen in each district as organized, and the additional member or members shall be chosen by the electors of the state at large; *and if the number of representatives shall be diminished, then the whole number shall be chosen by the electors of the state at large."* (Italics supplied.)

It is true that it has been for many years the policy of the state and national governments to elect congressmen by districts, and undoubtedly district representation is desirable, but for many years it has likewise been the policy of this state, as reflected by its statutory enactments, to require the election of congressmen from the state at large, in the absence of the valid redistricting of the state after a new apportionment; and there is no real conflict between the said sections 6277 and 5900 of the Code. Each of these statutes may fully operate in its own sphere; and, when considered together, I think there is found a complete answer to the suggestions of the majority in reference to the confusion and difficulties that might result in the holding of elections for congressmen if the writ should issue. Ample method has been provided by statute for placing the names of the prospective candidates on the ticket to be voted at the general election in November, and there should be no great confusion flowing from an observance of plain statutory provisions. Furthermore, I think the presumption should be indulged that neither party primary election officers nor other officials will intentionally create this

confusion by acting outside of and beyond the statutory law of the state.

The third and final ground upon which the denial of the writ is based is that to allow it would do more harm than good, would subvert that which has been a dominant and paramount consideration for nearly one hundred years in the election of congressmen, namely, the selection of these officers from districts, and would destroy the district representation unless and until the secondary and inferior consideration that these districts shall be equal in population shall be observed according to a strict rule of judicial measurement.

I emphatically dissent from the view advanced and supported by extended argument that in the formation of districts for the election of congressmen equality of representation is a secondary and inferior consideration. To my mind state-wide representation, which will necessarily grant equality in representation, is greatly preferable to representation by districts which discriminates in an unfair and unjust way against a large proportion of the people of the state, and destroys in a large measure their right to equal representaion. It is not a far step from partial destruction of the right representation to the total destruction thereof; and if one may be accomplished with impunity and without restraint, why may not the other? The only difference is one of degree, and if the only remedy must be found in public opinion of the majority who inflicted so great an injustice upon a minority, there can be but little hope of ever regaining the lost fundamental right of equal representation.

The principle of equality of representation lies at the very foundation of representative government. It is one of the fundamental principles upon which our government is based, and its preservation is necessary to the continued existence of the government in its present form. This principle was not considered secondary and inferior to any other consideration or right by our fore-

fathers, and, in the year 1773, the desire to attain the right of representation on a basis of equality gave rise to a rather famous "Tea Party" held in the city of Boston in protest against the denial of the right of representation. It is true that this expression of resentment and revolt was against a total denial of representation, while in the case now being considered, the denial is only partial; but the difference is only one of degree. I cannot agree that the right to equal representation is secondary and inferior to any other political consideration or purpose, or that it can ever be safely subordinated to political expediency.

Many instances of unchallenged inequalities in population in the congressional districts of other states have been cited as evidence of the fact that equality of representation has long been considered a subordinate or secondary question, but I do not think that the fact that the people of other states have remained quiescent in the face of injustice is any reason why the protesting people of this state should be denied relief; and it is significant that, in practically every instance where similar inequalities have been challenged in the courts, the districts so constituted have been stricken down. Again, it is proper to say that we are not advised as to the conditions existing in other states, or as to the obstacles with which their Legislatures were confronted, but I feel safe in asserting that no conditions, special interests, or obstacles confronted the Legislature of this state that would have prevented a reasonable approximation of equality in representation, having all the while due regard to "homogeneity in national interests and needs to be preserved."

I recognize, and have hereinbefore adverted to, the special interest of the people of the Mississippi Delta in levee and river improvements; but full protection of these interests presents no substantial obstacle to a reasonable approximation of equality in representation. No other obstacles to a fair and equitable districting of the

state are pointed out; and, in fact, none exists. No sufficient justification for disregarding the paramount law of Congress regulating the power of the Legislature in the formation of these districts can be based upon any local condition or diversity of interests of the people of this state.

I fully recognize the fact that mandamus is a discretionary writ and will not issue when in fact it will operate to the serious detriment rather than the benefit of the general public. This principle is fully supported by authority, but I know of no authority for the view that the rule favorable to the denial of the writ when comparative detriments and benefits are involved is stronger and broader when the enforcement of a public right is sought than when a private right is asserted. In my judgment, the rule is more limited when public rights are asserted, and this seems to me to be the clear inference to be drawn from the language of the court in the case of Effingham v. Hamilton, 68 Miss. 523, 10 So. 39, quoted by the majority opinion; the language to which I refer being as follows: "It is settled by numerous decisions that a sound judicial discretion is to be used, and, where circumstances make it unwise and inexpedient to allow this writ, to refuse it when sought to enforce *merely* private right."

I do not think the suggested political strife, *turmoil,* bitterness, and disturbance of the political peace of the state that might result from an election of congressmen from the state at large is a consideration of sufficient consequence and importance to weigh in any material respect against the issuance of the writ. I know of no way that it can now be determined that the field of candidates from the state at large would be larger, or even as large, as it will be in primary elections held in the seven districts. Certainly the opportunity for intensive canvassing among the people would not be as great in a campaign covering the entire state as it will be in a campaign by numerous district candidates cover-

ing the limited territory of each of the several districts. I can see no real reason why these district political campaigns will not engender as great political strife and turmoil as would a state-wide campaign for the same offices; but, in any event, I do not think the avoidance of some temporary political strife should be considered as any ground or justification for the refusal of the writ, when such refusal will result in depriving more than forty per cent of the people of the state of their just and equal proportion of the representation to which they are entitled, and which the Congress of the United States undertook to guarantee to them by the enactment of section 3 of the Act of 1911.

In addition to the suggested possible evils and public detriment that I have discussed, others are suggested as possibilities, but I am constrained to believe that most of them are shadows rather than real dangers or evils. In the language of Justice CALHOON, in the case of Hawkins v. Mangum, 78 Miss. 97, 28 So. 872, 875, I "see no hideous and destructive monsters looming in the perspective" of the judgment of the court below. The mandate of the supreme legislative body to which the Constitution of the United States has granted controlling power in these matters should be obeyed, and the courts should enforce obedience. In my judgment, the evils that will flow from denying a substantial part of the citizenship of this great state the fundamental right of equal representation in the Congress of the United States are far greater than any or all of the supposed evils that may result from the issuance of the proposed writ; and certainly this is true in view of the fact that any supposed evils flowing from the failure of the Legislature to properly redistrict the state can be corrected before the congressional election two years hence by the enactment of a fair, just, and equitable redistricting law.

In determining whether a writ of mandamus shall be granted or refused, a large measure of discretion is committed to the court. In the exercise of his judicial

discretion the learned and distinguished circuit judge, who heard this cause in the court below, ordered the issuance of the writ, and I do not think this court can properly say that in so doing he abused that discretion; and, as a consequence, I think the judgment of the court below should be affirmed.

I am authorized by Chief Justice SMITH to say that he concurs in the views herein expressed.